FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LARRY BOWOTO; BASSEY JEJE; OLA
OYINBO; BAYO OYINBO; DEJI
OYINBO; MARGARET IROWARINUN;
ROSELINE IROWARINUN; MARY
IROWARINUN; BOSUWO SEBI
IROWARINUN; CALEB IROWARINUN;
ORIOYE LALTU IROWARINUN;
TEMILOLA IROWARINUN; ADEGORYE
OLORUNTIMJEHUM IROWARINUN;
AMINORA JAMES IROWARINUN;
ENIESORO IROWARINUN; GBENGA
IROWARINUN; IBIMISAN IROWARINUN;
MONOTUTEGHA IROWARINUN;
OLAMISBODE IROWARINUN,
              *Plaintiffs-Appellants,*

                   v.

CHEVRON CORPORATION; CHEVRON
INVESTMENTS, INC.; CHEVRON
U.S.A., INC.,
              *Defendants-Appellees.*

No. 09-15641

D.C. No.
3:99-cv-02506-SI

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted
June 14, 2010—San Francisco, California

Filed September 10, 2010

13889

Before: Mary M. Schroeder and Jay S. Bybee,
Circuit Judges, and Owen M. Panner,*
District Judge.

Opinion by Judge Schroeder;
Concurrence by Judge Panner

*The Honorable Owen M. Panner, Senior United States District Judge
for the District of Oregon, sitting by designation.

## COUNSEL

Theresa M. Traber, Pasadena, California, for plaintiffs-appellants Larry Bowoto, et al.

Craig E. Stewart, San Francisco, California, for defendants-appellees Chevron Corporation et al.

## OPINION

SCHROEDER, Circuit Judge:

### INTRODUCTION

This case arises from a violent episode that occurred on the Parabe oil platform nine miles off the coast of Nigeria in

1998. The platform was operated by Chevron Nigeria Limited ("CNL"), a subsidiary of the world oil giant. On May 25, 1998, over 100 native Nigerians took over the Parabe platform to protest CNL's destruction of the environment and refusal to provide jobs to the local population. The parties here dispute whether the protest was peaceful. There is no dispute, however, that, after the protest entered its fourth day, CNL sought the assistance of the Nigerian Government Security Forces ("GSF") to end the protest. When the GSF soldiers arrived on the platform, they shot a number of the protestors, killing two.

In 1999, the injured protestors and family of a deceased protestor filed a lawsuit in the Northern District of California against three American-based Chevron companies ("Chevron"), raising a number of claims related to the GSF raid of the Parabe platform. After ten years of pretrial litigation and discovery, the claims of Larry Bowoto, Bassey Jeje, and the families of Arolika Irowarinun and Bola Oyinbo (collectively "Plaintiffs") were tried before a jury. These plaintiffs brought claims under the Alien Tort Statute ("ATS"), Nigerian law, and California law. The jury rendered a verdict in favor of Chevron on all claims, and Plaintiffs now appeal.

This appeal raises challenges principally to the jury instructions and the district court's evidentiary rulings. We find no abuse of discretion in the district court's decisions admitting the pieces of challenged evidence. We also find no error in the jury instructions provided.

There are only two legal issues in this appeal, both relating to statutes Congress adopted to incorporate principles of international law. The first issue is whether the federal Death on the High Seas Act ("DOHSA") preempts wrongful death and survival claims brought under the ATS. The other legal issue is whether corporations can be found liable under the Torture Victim Protection Act ("TVPA"). We affirm the dismissal of the ATS wrongful death and survival claims and agree with

the district court that Congress did not intend the TVPA to apply to corporations.

We therefore affirm the district court's judgment.

**BACKGROUND**

In 1961, the Nigerian government entered into a joint venture with Chevron to harness the resources of the oil-rich Niger Delta. The resulting company, CNL, has since opened a number of oil fields and offshore platforms, extracting billions of dollars worth of oil from Nigeria. According to Plaintiffs, CNL's success has provided little or no benefit to most Nigerians. Rather, CNL has allegedly shown total disregard for the environment, with oil spills wreaking havoc on local water supplies and fisheries.

In the mid-1990s a number of Nigerian tribes, seeking to provide a unified front against CNL, joined forces and formed a group called the Concerned Ilaje Citizens ("CIC"). CIC sought to have CNL curb its environmental abuses, and to provide more jobs to Nigerians. CNL, however, refused to recognize or negotiate with CIC, and as a result, tensions between the two escalated. CIC sought to get CNL's attention by staging a large protest, and chose CNL's Parabe oil platform as the site. Plaintiffs claim that the protest was to be a peaceful one, effectively a sit-in that would force CNL to recognize CIC's concerns.

On May 25, 1998, over 100 members of CIC, including Plaintiffs, traveled via canoes to the platform. What happened over the next days is a matter of dispute. According to Plaintiffs, they came to the platform peacefully and unarmed, holding signs and singing. They claim the CNL workers, most of whom were not Nigerian, allowed them onto the platform without resistance, and that there were no tensions between them and the workers throughout the protest.

According to Chevron, the protestors were violent and boisterous; some had brought weapons and attacked CNL workers. Chevron also disputes the contention that the protestors and workers had an amicable relationship. To the contrary, Chevron contends its workers were being held hostage and were told they could not leave under threat of violence.

CNL convened a crisis management team ("CMT") to monitor the situation on the platform, and sent a company representative there in hopes of brokering a peaceful end to the protest. According to Chevron, these negotiations were unsuccessful, and the situation steadily became more volatile on the platform. Faced with the failed negotiations and the deteriorating conditions on the platform, CNL determined that it had to take action to protect the welfare of its workers. On the fourth day of the protest, CNL sought the assistance of the GSF to rescue the workers and stop the protest.

The GSF arrived on the platform via helicopter, opening fire on the protestors shortly after landing. Several protestors were injured, including Plaintiffs Bowoto and Jeje. Two died as a result of their injuries, including Irowarinun. The GSF arrested a number of protestors, and transported them to land where they were allegedly tortured. Oyinbo was one of the protestors arrested and allegedly tortured by the GSF. Oyinbo died prior to trial for reasons not relevant here.

In 1999, a number of CIC protestors who were injured in the Parabe protest filed a lawsuit against Chevron for injuries sustained during the incident. Plaintiffs ultimately did not pursue claims against CNL or any of the individuals involved in the Parabe incident. Over the next decade, a series of pre-trial rulings reduced the number of claims.

The district court issued three pre-trial rulings that are challenged on appeal. First, in a published decision, the district court held that DOHSA preempts the summary execution claim brought under the ATS. *Bowoto v. Chevron Corp.*, 557

F. Supp. 2d 1080, 1086-88 (N.D. Cal. 2008) (*Bowoto I*). The court pointed to Supreme Court decisions holding that DOHSA preempts claims and remedies brought under state law and general maritime law. *Id.* at 1087. Relying on these opinions, the court reasoned that DOHSA provides the exclusive remedy for wrongful deaths that occur on the high seas. *Id.* at 1087-88. In a later unpublished order, the district court employed similar reasoning to hold that DOHSA also preempts survival actions under the ATS. *Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2008 WL 2872624 (N.D. Cal. July 23, 2008).

In the final pre-trial decision at issue, the district court held that Plaintiffs could not bring claims against Chevron under the TVPA. *Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2006 WL 2604591 (N.D. Cal. Aug. 22, 2006). The district court observed that the statute permitted claims to be brought only against "an individual" who committed torture. The district court reasoned that because Congress used the term "individual," it did not intend for the TVPA to apply to corporations.

The primary claims at trial were common law actions for negligence and intentional torts under California and Nigerian law, along with international law claims brought under the ATS. The trial lasted over five weeks, with testimony from a total of 73 witnesses. Plaintiffs' theory at trial was that the Parabe protest was peaceful, and that CNL sought GSF assistance knowing the soldiers would violently attack the protestors. Plaintiffs further sought to impute CNL's wrongful conduct to Defendant Chevron.

Chevron countered these allegations by portraying the protestors as violent and unpredictable, and argued CNL sought the assistance of the GSF as a last resort. Chevron further argued that the GSF fired on protestors in self-defense.

The jury found in favor of Chevron on all claims. Plaintiffs have appealed.

## I.  The Plaintiffs May Not Pursue Claims Under the Alien Tort Statute

Of the four victim Plaintiffs in this case, one died as a result of the injuries suffered on the Parabe platform. The family of this Plaintiff sought to raise a claim under the ATS for summary execution, and also several survival claims rooted in the ATS. The district court barred Plaintiffs from presenting the summary execution and survival claims to the jury, finding that DOHSA preempts ATS wrongful death and survival claims. *See* 557 F. Supp. 2d at 1086-88. We affirm the district court's dismissal of the ATS claims.

**[1]** The Supreme Court more than a century ago held in *The Harrisburg*, 119 U.S. 199 (1886), that maritime law did not recognize a cause of action for wrongful death. Congress repudiated this holding in 1920 with the passage of DOHSA, in order to provide a remedy in admiralty "for wrongful deaths more than three miles from shore." *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 620 (1978). DOHSA creates the cause of action for the decedent's immediate family; it limits recovery to pecuniary damages, eliminates any contributory negligence bar to recovery, and preserves the ability to bring claims under the law of another country. *See* 46 U.S.C. §§ 30301-30308; *see also Higginbotham*, 436 U.S. at 620 (describing provisions of DOHSA).

**[2]** Due to DOHSA's comprehensive scope, the Supreme Court has determined the Act displaces other remedies and causes of action. In *Higginbotham*, the Court held that DOHSA bars recovery of damages for loss of society under maritime law. *Id.* at 623-24. The Court recognized that DOSHA "does not address every issue of wrongful-death law," but stated that where the Act does speak to a topic, courts were not free to "supplement" the remedies already provided for in the statute. *Id.* at 625. The Court thus found that because DOHSA does speak to the issue of damages by

limiting recovery to pecuniary loss, plaintiffs could not obtain damages for loss of society under maritime law. *Id.* at 622-25.

In *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 232-33 (1986), the Court held that DOHSA preempts state law wrongful death statutes. The Court noted that in passing DOHSA, Congress sought to create a uniform remedy for deaths on the high seas, "an area where the federal interests are primary," and found that permitting concurrent state law wrongful death suits would jeopardize that uniformity. *Id.* at 233.

The Court later determined that DOHSA also preempts maritime law survival claims. *See Dooley v. Korean Air Lines Co., Ltd.*, 524 U.S. 116, 122-24 (1998). The plaintiffs there contended that DOHSA does not preempt such claims, arguing that the statute, which authorizes recovery for losses suffered by the decedent's family, says nothing that would preclude raising survival claims on the decedent's behalf. *Id.* at 123. The Court rejected this distinction, finding that by "authorizing only certain surviving relatives to recover damages, and by limiting damages to the pecuniary losses sustained by those relatives, Congress provided the exclusive recovery for deaths that occur on the high seas." *Id.* The Court went on to hold that "[b]ecause Congress has chosen not to authorize a survival action for a decedent's pre-death pain and suffering, there can be no general maritime survival action for such damages." *Id.* at 124. The Court has thus, in a series of cases, determined that DOHSA should be construed according to its terms to provide the remedy under United States law for deaths occurring more than three miles from shore.

**[3]** Against that backdrop, we first examine the district court's determination that DOHSA preempts all ATS wrongful death claims. We do not necessarily agree with the district court's determination that *Higginbotham*, *Tallentire*, and *Dooley* foreclose the possibility of there ever being a cognizable ATS claim invoking principles of international law to

recover for a death at sea. As the Court stated in *Higgin-botham*, DOHSA "does not address every issue of wrongful-death law." 436 U.S. at 625. There may then be situations where a plaintiff can simultaneously pursue claims under both DOHSA and the ATS. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 720 (2004) (noting that claims arising out of acts of piracy are recognized under the ATS).

**[4]** With respect to Plaintiffs' summary execution claim under the ATS, however, whether and to what extent the district court may have erred is immaterial so long as the error did not prejudice Plaintiffs. There could have been no prejudice if the jury would have found against Plaintiffs on this claim in any event. *See Tennison v. Circus Circus Enterprises, Inc.*, 244 F.3d 684, 691 (9th Cir. 2001) (finding that a jury's rejection of a sexual harassment claim made any error in failing to instruct on intentional infliction of emotional distress harmless). The jury in this case squarely rejected a wrongful death claim brought under Nigerian law that was nearly identical to the summary execution claim Plaintiffs contend the district court erroneously dismissed. The wrongful death claim under Nigerian law required Plaintiffs to prove that "Irowarinun's death was caused by a battery or negligent act by Chevron Nigeria Ltd. and/or the Nigerian Government Security Forces." Summary execution would have required, in material part, Plaintiffs to show that CNL and/or GSF "committ[ed] a wrongful, tortious act in excess of [their] authority over" Irowarinun that resulted in his death. *See Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1543 (N.D. Cal. 1987) (describing a summary execution claim). Both summary execution and wrongful death under Nigerian law therefore require a showing that the decedent died due to the wrongful conduct of the defendant.

**[5]** We therefore conclude that even assuming the district court erred in dismissing the summary execution claim, there was no prejudice. This is because summary execution and Nigerian wrongful death law "are predicated on the same

facts and similar legal inquiries," so that the jury's rejection of the Nigerian law claim makes it "highly unlikely" that it would have found in favor of Plaintiffs on a summary execution claim. *See Tennison*, 244 F.3d at 691. We further find that any difference in the burden of proof between the ATS, preponderance, and Nigerian law, beyond a reasonable doubt standards, is immaterial under the circumstances of this case. The jury rejected a total of 20 common law claims brought by Plaintiffs under a variety of burdens of proof. There is no reason to believe the jury would have found a summary execution claim meritorious under any standard. We therefore affirm the district court's dismissal of the ATS claim for summary execution.

With respect to Plaintiffs' ATS survival claims, we will not similarly infer that the jury would have rejected these claims, because Chevron has not shown that any claim presented to and rejected by the jury was materially similar to the survival claims. We must therefore decide whether DOHSA preempts ATS survival claims, and for the following reasons we conclude it does.

The Supreme Court in *Dooley* held that DOHSA preempts survival claims brought under maritime law. *See* 524 U.S. at 124. Plaintiffs do not dispute this point, but they argue *Dooley* does not bar survival claims brought under other federal statutes such as the ATS. To resolve the issue, we look to the reasoning underlying *Dooley*'s holding.

**[6]** The Court in *Dooley* looked to the precision with which Congress defined the DOHSA remedy and to the legal principle that a specific statute usually preempts more general remedies. *See id.*; *see also Hinck v. United States*, 550 U.S. 501, 506 (2007) (stating that it is a "well-established principle, that in most contexts, a precisely drawn, detailed statute pre-empts more general remedies") (internal quotation marks omitted). The Court described DOHSA as a "comprehensive" statute that "expresses Congress' considered judgment . . . on

the availability and contours of a survival action in cases of death on the high seas." *Id.* (internal quotation marks omitted). *Dooley* thus held that DOHSA preempts *all* survival claims for deaths on the high seas unless there is clear indication that Congress intended otherwise.

**[7]** There is no evidence that Congress intended ATS survival claims to remain viable after the passage of DOHSA. In contrast to the comprehensive scope of DOHSA, the ATS is only "a jurisdictional statute creating no new causes of action." *See Sosa*, 542 U.S. at 724. Unlike DOHSA, the ATS does not speak to the issue of survival claims. This court did not even recognize that survival claims were cognizable under the ATS until 70 years after DOHSA's passage. *See Hilao v. Estate of Marcos*, 25 F.3d 1467, 1476 (9th Cir. 1994). We thus hold that DOHSA provides Plaintiffs' only available means for raising survival claims.

Plaintiffs point to the Jones Act and contend it undercuts our conclusion. The Jones Act, as relevant here, allows the family of a deceased seaman to pursue survival claims on his behalf. *See* 46 U.S.C. § 30104. Both the Supreme Court and this court have suggested that DOHSA does not preempt these survival claims. *See Dooley*, 524 U.S. at 124; *Davis v. Bender Shipbuilding and Repair Co., Inc.*, 27 F.3d 426, 428 n.1 (9th Cir. 1994) ("The heirs of a seaman who has died on the high seas may pursue a claim under DOHSA or the Jones Act."). The distinction between the Jones Act and the ATS, however, is that the Jones Act is itself a comprehensive statute that addresses a specific issue in maritime law. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 29 (1990) (stating "the Jones Act establishes a uniform system of seaman's tort law"). Congress passed DOHSA and the Jones Act in the same year in order to provide parallel remedies for the damages a death caused to the seaman's family and to the estate. The statutes were intended to repudiate totally the rule of *The Harrisburg*. *See Dooley*, 524 U.S. at 124. It is evident that Congress intended DOHSA and the Jones Act to work together. *See Miles*, 498

U.S. at 29 (referring to the Jones Act as DOHSA's "companion statute"). There was no such intent with respect to DOHSA and the ATS, enacted more than a century apart.

The Supreme Court's decision in *Kernan v. American Dredging Co.*, 355 U.S. 426 (1958), forty years before *Dooley*, does not provide Plaintiffs much assistance. *Kernan* did not involve DOHSA at all. It involved the relationship between the Federal Employer's Liability Act and the Jones Act. *See id.* at 439. The Court there assumed, in passing, that DOHSA would not preempt a state law survival claim. *See id.* at 430 n.4 ("Presumably any claims, based on unseaworthiness, for damages accrued prior to the decedent's death would survive, at least if a pertinent state statute is effective to bring about a survival of the seaman's right."). *Dooley*, however, later squarely held that DOHSA provides the Plaintiffs' sole recourse for survival claims.

**[8]** We therefore affirm the district court's ruling dismissing the ATS claims arising from Irowarinun's death.

## II.   The Torture Victim Protection Act Does Not Apply to Corporations

**[9]** Congress passed the TVPA in 1992 "to carry out obligations of the United States under the United Nations Charter and other international agreements pertaining to the protection of human rights by establishing a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing." Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350). The question in this appeal is whether Congress intended to permit such civil actions against corporations. We agree with the district court that it did not, and hold that the plain language of the TVPA does not allow for suits against a corporation.

**[10]** We begin with the statutory language of the TVPA. The TVPA's liability provision provides that only an "individual" may be held liable under the Act; it states:

(a) Liability.—An individual who, under actual or apparent authority, or color of law, of any foreign nation—

(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350, note § 2(a). The district court here reasoned that by extending liability only to "[a]n individual," Congress intended that only natural persons, and not corporations, could be found liable under the Act. In so doing, the district court adopted a position consistent with the majority of district courts that have considered the issue. *See, e.g.*, *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1026 (W.D. Wash. 2005); *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 28 (D.D.C. 2005); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1175-76 (C.D. Cal. 2005). *But see Estate of Rodriquez v. Drummond Co. Inc.*, 256 F. Supp. 2d 1250, 1266-67 (N.D. Ala. 2003) (finding corporations can be liable under TVPA); *Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345, 1358-59 (S.D. Fla. 2003) (same).

The district court's decision did conflict with the one Circuit court to mention the issue. The 11th Circuit has said that corporations can be found liable under the TVPA. *See Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1250-52 (11th Cir. 2005). It does not appear the defendants in that case ever challenged the notion of corporate liability, however, and the Eleventh Circuit did not explain its reasoning on the issue. *See, e.g.*, *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008).

**[11]** We agree with the district court that Congress's use of the word "individual" throughout the statute indicates that it did not intend for the TVPA to apply to corporations. Indeed, Congress has directed courts to presume the word "individual" in a statute refers to natural persons and not corporations. In the Dictionary Act, Congress provided definitions for a number of common statutory terms that courts are to apply "unless the context indicates otherwise." *See* 1 U.S.C. § 1. One term defined is "person," which the Dictionary Act defines as being broader than a reference to an individual. The Act defines "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. The Dictionary Act therefore speaks of "corporations" and "individuals" as distinct terms, and we must therefore presume those terms have different meanings. *See id.*

Despite the presumption of the Dictionary Act, our court has recognized that the use of the word individual in a statute "does not necessarily exclude corporations." *See United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000). In *Middleton,* this court looked to a statute that criminalized hacking into the computer system of "one or more individuals." *Id*. The court found that "individual" encompassed corporations because the statute used the words "individual" and "person" interchangeably throughout, thus indicating that Congress did not intend for the presumption of the Dictionary Act to apply. *Id.* at 1211 ("Congress used 'individuals' and 'person' in a non-technical manner, without reference to the Dictionary Act."); *see also Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (finding that "individual" as used in the Line Item Veto Act included both natural persons and corporations).

**[12]** Here, in contrast, it is evident that Congress drafted the TVPA in such a manner as to limit liability to natural persons. The TVPA consistently uses "individual" throughout the statute to refer both to the torturer and the victim of torture.

*See, e.g.*, 28 U.S.C. § 1350, note § 2(a) ("An individual who . . . subjects an individual to torture."). Corporations, of course, cannot be tortured. *See Middleton*, 231 F.3d at 1211 (noting that "[c]orporations . . . cannot suffer physical injury") (internal quotation marks omitted). Plaintiffs ask us to give the same word different meanings in the same statute. They ask us to interpret "individual" to mean a natural person when referring to the victim, but to mean either a natural person or a corporation when referring to the torturer. This interpretation of the statute runs counter to the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Commissioner v. Lundy*, 516 U.S. 235, 250 (1996) (citation omitted). There is no indication Congress intended "individual" to have a variety of meanings throughout the TVPA.

Indeed, the legislative history demonstrates that Congress rejected the notion of corporate liability. When first introduced in 1987, the TVPA imposed liability on any "person" who subjected another to torture. *See* The Torture Victim Protection Act: Hearing and Markup before the H. Comm. on Foreign Affairs on H.R. 1417, 100th Cong. 82, 85 (1988). The House Foreign Affairs Committee amended the bill to substitute "individual" for "person" in order to "make it clear [they] were] applying [the Act] to individuals and not to corporations." *Id.* When introduced five years later, the TVPA still spoke of liability for individuals.

**[13]** Neither the Senate nor House report, moreover, even hint at corporate liability. *See* The Torture Victim Protection Act of 1991, S. Rep. 102-249 (1991); Torture Victim Protection Act of 1991, H.R. Rep. 102-367 (1991). Had Congress intended for the court to interpret the term "individual" so broadly as to include corporations, it would have included some evidence of this intent in the legislative history. *See In re Goodman*, 991 F.2d 613, 619 (9th Cir. 1993) (finding "individual" as used in a statute did not include corporations because there was "no legislative history showing that the

section was meant to apply to" corporations) (citation omitted). We thus conclude that both the text and legislative history indicate Congress did not intend to allow suits against corporations under the TVPA.

Plaintiffs offer an alternative argument that they may sue Chevron under the TVPA upon a theory of "aiding and abetting." Plaintiffs contend that corporations can be found vicariously liable for torture they direct individuals to commit. The TVPA, however, does not contemplate such liability. It limits liability to "[a]n individual" who subjects another to torture. *See* 28 U.S.C. § 1350, note § 2(a). Even assuming the TVPA permits some form of vicarious liability, the text limits such liability to individuals, meaning in this statute, natural persons. The language of the statute thus does not permit corporate liability under any theory.

**[14]** We therefore affirm the district court's ruling that the TVPA does not apply to corporations.

## III.  Challenges to Jury Instructions

Plaintiffs raise a series of challenges to the jury instructions, arguing first that the battery instruction incorrectly allocated the burden of proof on a key element, and second that the instructions pertaining to affirmative defenses misstated the law. We review each argument in turn and affirm.

### Battery

Plaintiffs tried their battery claims to the jury under both Nigerian and California law. The district court provided a single jury instruction for battery after determining that Nigerian and California law on this tort was the same. This instruction required Plaintiffs to prove the elements of common law battery, and additionally gave them the burden of demonstrating the GSF used unreasonable force. Plaintiffs here challenge this instruction and argue that under both Nigerian and Cali-

fornia law, Chevron should have had to prove reasonable force as an affirmative defense.

To support their challenge under Nigerian law, Plaintiffs would have us rely on the English Court of Appeal's decision in *Ashley v. The Chief Constable of Sussex Police*, [2006] EWCA (Civ) 1085, [20]-[28], for the proposition that plaintiffs trying a civil battery claim are never required to show unreasonable force as a part of their prima facie case. But even if we were to agree with Plaintiffs that *Ashley* supports their position, Plaintiffs concede that English cases carry only persuasive weight in Nigerian courts.

**[15]** Chevron relies on the Nigerian Supreme Court's decision in *Okuarume v. Obabokor*, [1965] N.S.C.C. 286, 287 (S.C.), and we agree that it is more authoritative. In *Okuarume*, the Nigerian court held that both civil and criminal battery require that the plaintiff/prosecution prove the charge beyond a reasonable doubt. *See id.* In so doing, the court stated there was a policy in Nigerian courts of applying the same standard to civil and criminal battery in order to avoid the situation where "a person who alleges that he was assaulted might fail to prove the assault in a criminal prosecution and yet obtain judgment in civil proceedings." *Id.* In criminal battery cases under Nigerian law the prosecution has the burden of proving unreasonable force. *See* Criminal Code Act, (1990) Cap. 77, §§ 252-253 (Nigeria). Under *Okuarume*, therefore, it remained Plaintiffs' burden to prove that the GSF used unreasonable force during the Parabe raid. We find no error in the Nigerian law battery instruction.

With respect to the California law battery instruction, Plaintiffs waived any claim of error because they never offered an instruction on the key issue. Under California law, a plaintiff bringing a battery claim against a law enforcement official has the burden of proving the officer used unreasonable force. *See Edson v. City of Anaheim*, 74 Cal. Rptr. 2d 614, 615-17 (Ct. App. 1998); *see also Saman v. Robbins*, 173

F.3d 1150, 1157 n.6 (9th Cir. 1999) ("A prima facie case for battery is not established under California law unless the plaintiff proves that an officer used unreasonable force against him to make a lawful arrest or detention."). Therefore if the GSF was acting in a law enforcement capacity, California law would require that Plaintiffs show it used unreasonable force. Plaintiffs contend the GSF did not act as a government sanctioned law enforcement organization in stopping the protest, but rather as CNL's private security company. Plaintiffs then argue that it was for the jury — not the district court — to decide the factual question of whether the GSF was a government or private force, and thus decide which party had the burden on the reasonableness of force issue.

Plaintiffs' argument fails because in district court they never offered any jury instruction on the issue. *See EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 683 (9th Cir. 1997) (finding that a party waived an argument for which it did not request a jury instruction). Plaintiffs did argue to the district court that it was inappropriate to assume the GSF acted in a law enforcement capacity at Parabe, but they never proposed an instruction that would have allowed the jury to decide this question. Plaintiffs cannot now claim the district court erred by not providing an instruction they never offered. *See id.* The argument they now urge on appeal has been waived.

### Affirmative Defenses

Plaintiffs raise several claims of error with respect to the "Privileges, Duties, and Defenses" section in the jury instructions. These instructions listed a series of affirmative defenses to Plaintiffs' negligence claims that shielded Chevron from liability if the jury determined that CNL sought GSF assistance because of a reasonable belief that the Parabe protestors were engaged in criminal activity.

**[16]** Plaintiffs first claim that, under Nigerian law, a party reporting criminal activity is liable for any wrongful conduct

the government commits in stopping the alleged crime. This argument, however, was rejected in *Ezeadukwa v. Maduka*, [1997] 8 N.W.L.R. 635 (C.A.), where a Nigerian appellate court stated that "liability does not attach to a private citizen who merely names a suspect" to the police. Plaintiffs next argue the wording of the affirmative defense instruction allowed the jury to find in favor of Chevron even if CNL played a "direct role" in the GSF's alleged torts. But the challenged instruction made clear that Chevron could not "be liable merely for [CNL's] reporting [criminal] activity to the Nigerian authorities."

Finally, plaintiffs are finally incorrect that the affirmative defense instruction suggested Plaintiffs had the burden to negate certain elements of Chevron's affirmative defenses. The instruction clearly required Chevron to prove all of the listed elements in order for the defenses to apply.

**[17]** We find no error with any of the jury instructions.

## IV.   Plaintiffs' Evidentiary Challenges

Plaintiffs raise four evidentiary challenges, claiming the district court admitted irrelevant and unfairly prejudicial evidence in violation of Federal Rules of Evidence 401 and 403.

Plaintiffs first challenge the admission of the testimony of the captain of a CNL tugboat tethered to the Parabe platform during the protest. He testified that after the GSF commenced the raid on the platform, a group of CIC protestors kidnaped him and his crew and held them hostage on shore for several days. The district court overruled Plaintiffs' objection to this testimony, finding that it rebutted Plaintiffs' position that the protestors did not act violently towards CNL workers.

**[18]** The district court did not abuse its discretion in admitting this testimony because Plaintiffs opened the door to evidence of the tug kidnaping incident. During opening

statement, counsel for Plaintiffs referred to the tug kidnaping, characterizing the event as a desperate attempt of some protestors to elude the GSF violence. This reference, likely designed to "pull the sting" of the captain's anticipated testimony, provided a non-sinister motive for the actions of the protestors for the jury to consider as it heard Chevron's version of the incident. The present challenge is therefore precluded because "a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." *Ohler v. United States*, 529 U.S. 753, 755 (2000); *see also United States v. Chavez*, 229 F.3d 946, 952 (10th Cir. 2000) ("It is widely recognized that a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party.").

**[19]** Plaintiffs next claim the admission of a series of photographs showing a CIC protestor using a machete to kill a sea turtle at some point during the protest was irrelevant and unfairly prejudicial. Yet, plaintiffs put a number of witnesses on the stand who consistently testified that they saw no weapons or other indications that the CIC protestors were violent. These photographs of a protestor holding a large machete were relevant in that they undercut Plaintiffs' version of events. *See United States v. Terry*, 760 F.2d 939, 943-44 (9th Cir. 1985) (noting that evidence is relevant if it undercuts the testimony of a witness from the opposing side). The district court did not abuse its discretion in allowing Chevron to rebut Plaintiffs' story on a key issue.

Plaintiffs' third evidentiary challenge pertains to the testimony of CNL employees John Stapleton and Randall Hervey. Hervey testified to information about the protesters' conduct that he obtained from Stapleton and then conveyed to the Chevron CMT. The district court admitted this testimony subject to the limiting instruction that the jury was to consider this evidence only to show what information CNL decision makers had when CNL decided to call in the GSF.

**[20]** Plaintiffs contend the testimony was irrelevant because there was no evidence that the CNL employee who made the final decision to call in the GSF relied on information from either witness. This argument is not supported by the record. Stapleton indicated at several points in his testimony that he passed to Hervey information he received from the platform. Hervey in turn testified that he discussed this information at CMT meetings that Davis attended. Davis, for his part, testified that he considered Hervey one of his "principal sources" of information during the protest. The testimony at trial demonstrates that the information Stapleton obtained from the platform was relied on to some extent by Davis when he called in the GSF. There was no abuse of discretion.

**[21]** Plaintiffs additionally challenge the admission of a portion of the testimony of the CNL employee who was sent to negotiate with CIC leaders and whose testimony referred to four instances where local Nigerians had kidnaped CNL employees. The district court issued a limiting instruction stating that the reference to the four kidnapings could only be considered to show the employee's state of mind during negotiations. The testimony was relevant because his determination that negotiations had failed was instrumental in CNL's decision to seek GSF assistance. The testimony that he was afraid that he would be kidnaped provided context for his assessment of the status of negotiations. The district court was within its discretion in admitting this testimony.

**[22]** Plaintiffs finally argue that the district court erred by failing to provide a detailed explanation as part of each challenged ruling, of why the evidence was not unfairly prejudicial. The district court, however, was not required to engage "in a mechanical recitation of Rule 403's formula on the record . . . [a]s long as it appears from the record as a whole that the trial judge adequately weighed the probative value and prejudicial effect of proffered evidence before its admission." *United States v. Sangrey*, 586 F.2d 1312, 1315 (9th Cir. 1978). The record here indicates the district court was well

aware of Rule 403 and the factors it requires to be weighed. Plaintiffs' objections in district court to the challenged evidence all raised the issue of prejudice. For that reason, Rule 403 must have "figured crucially in the court's mind." *United States v. Verduzco*, 373 F.3d 1022, 1030 n.2 (9th Cir. 2004) (finding district court did not err in admitting evidence even though it did not explicitly balance Rule 403 factors). We cannot accept Plaintiffs' argument that the experienced trial judge in this case overlooked the Federal Rules of Evidence.

## CONCLUSION

The judgment of the district court is **AFFIRMED**.

---

PANNER, District Judge, concurring:

I am pleased to concur in the excellent, well-reasoned opinion of the court. I write separately to express the view that we are deciding only DOHSA's preemptive effect on the survival claims brought here under the ATS.