OPINION
Opinion by Judge SCHROEDER, Circuit Judge, with whom SILVERMAN and BERZON, Circuit Judges, join. PREGERSON and RAWLINSON, Circuit Judges, join as to all but Parts IV(C) and (D) and partially join Part IV(B)(3). REINHARDT, Circuit Judge, joins as to all but Part 11(C) and Part IV(B)(3), as to which he concurs in the result.
McKEOWN, Circuit Judge,
joins as to all but Part IV(A)(3) and Part IV(B)(4):
I. INTRODUCTION
This is an Alien Tort Statute (ATS) case arising out of the operations of Rio Tinto mining group (Rio Tinto) on the island of Bougainville in Papua New Guinea (PNG) and the uprising against Rio Tinto in the late 1980’s that resulted in the use of military force and many deaths. The Plaintiffs are current or former residents of the island of Bougainville. The ATS provides that “district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in viola *743 tion of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350.
This is the second time this case has been before this en banc court. See Sarei v. Rio Tinto PLC (Rio Tinto III), 550 F.3d 822, 825-26 (9th Cir.2008). The facts are laid out comprehensively in the original district court opinion. See Sarei v. Rio Tinto PLC (Rio Tinto I), 221 F.Supp.2d 1116, 1121-27 (C.D.Cal.2002). The origin.1 three-judge panel majority and dissenting opinions were divided on the issue of exhaustion of local remedies. Sarei v. Rio Tinto PLC (Rio Tinto II), 487 F.3d 1193 (9th Cir.2007). As a result, our first en banc decision focused on that issue. Rio Tinto III, 550 F.3d 822. A majority of this en banc court took the view that exhaustion must be considered, with the narrower, and therefore controlling, plurality opinion by Judge McKeown stating that only prudential exhaustion principles apply. Id. at 832 n. 10.
On remand, the district court held that it would be inappropriate to impose a prudential exhaustion requirement on Plaintiffs’ claims for crimes against humanity, war crimes, and racial discrimination. Sarei v. Rio Tinto pic (Rio Tinto IV), 650 F.Supp.2d 1004, 1032 (C.D.Cal.2009). It held the remaining claims required exhaustion. The court, therefore, gave Plaintiffs the choice either to withdraw or to submit the following claims to the traditional two-step exhaustion analysis: violation of the rights to health, life, and security of the person; cruel, inhuman, and degrading treatment; international environmental violations; and a consistent pattern of gross human rights violations. Id.
Plaintiffs opted to withdraw those claims, reserving the right to file an amended complaint if the matter is remanded. Id. n. 71. Thus, the only claims before this court on appeal are Plaintiffs’ claims for genocide, crimes against humanity, war crimes, and racial discrimination.
The ATS, as Judge Friendly explained more than three decades ago in IIT v. Vencap, Ltd., “is a kind of legal Lohengrin; although it has been with us since the first Judiciary Act, § 9, 1 Stat. 73, 77 (1789), no one seems to know whence it came.” 519 F.2d 1001, 1015 (2d Cir.1975). This case has been a perplexing one for the judges of this circuit because of the new legal uncertainties in the application of the ATS that flowed in the wake of the Supreme Court’s decision in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).
In Sosa, the Supreme Court held that the ATS is a jurisdictional grant for a limited category of claims for violation of internationally accepted norms. 542 U.S. at 729, 124 S.Ct. 2739. The statute was “enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations ... based on the present-day law of nations ... resting] on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized [violation of safe conducts, infringement of the rights of ambassadors, and piracy].” Id. at 724-25, 124 S.Ct. 2739.
Internationally accepted norms must be “specific, universal, and obligatory.” Sosa, 542 U.S. at 732, 124 S.Ct. 2739 (citing with approval In re Estate of Ferdinand Marcos, Human Rights Litig. (Marcos II), 25 F.3d 1467, 1475 (9th Cir.1994)). Thus, in discussing the definite nature of an international norm that gives rise to a cause of action in an ATS suit against a private actor, the Supreme Court also noted that “a related consideration is whether international law extends the scope of liability for a violation of a given norm to the *744 perpetrator being sued, if the defendant is a private actor such as a corporation or individual.” Id. at 732 n. 20, 124 S.Ct. 2739.
With regard to the specific claims before us, we conclude that only Plaintiffs’ claims of genocide and war crimes fall within the limited federal jurisdiction created by the Act, and that the crimes against humanity arising from a blockade and the racial discrimination claims do not. Under international law, there is a distinction between genocide and crimes against humanity. We discuss this distinction in Section TV of this opinion when we deal with the specific claims. Before discussing each claim, however, we must deal with and reject the more sweeping legal principles that Rio Tinto and our dissenting colleagues argue require dismissal of the entire action. Those include the contentions that we lack jurisdiction under the ATS because all of these claims arise extraterritorially, are claims against corporations, or constitute claims of aiding and abetting liability outside the scope of international law. We also address Judge Ikuta’s dissenting contention, not raised by any party, that the Act gives federal courts no authority to hear cases between aliens because cases under the ATS are diversity cases that do not “arise under” the laws of the United States. We then reach Rio Tinto’s alternative contentions that the claims in this suit are nonjusticiable on the grounds that they require prudential exhaustion, constitute political questions, are barred by principles of international comity, or invalidate acts of state.
Although the torts alleged all occurred outside of the United States, Rio Tinto has substantial operations in this country. According to the complaint, Rio Tinto operates in 40 different countries and, as of December 31, 1999, had consolidated operating assets of nearly $13 billion—47% of which are located in North America. Personal jurisdiction is not disputed.
II. JURISDICTIONAL ISSUES
A. Extraterritoriality
Extraterritoriality is generally a question of statutory interpretation going to the merits of a case. Morrison v. Nat’l Australia Bank Ltd., — U.S. —, 130 S.Ct. 2869, 2877, 177 L.Ed.2d 535 (2010). Because the Supreme Court in Sosa established that the ATS is a jurisdictional statute, 542 U.S. at 712, 124 S.Ct. 2739, however, and because Rio Tinto argues that we lack jurisdiction to apply the Act extraterritorially, we consider extraterritoriality in this case under the heading of jurisdictional issues.
This case concerns conduct that occurred outside the United States. Rio Tinto points to a series of cases that deny extraterritorial effect and pertain to a variety of other statutes in order to argue that the ATS does not apply extraterritorially. EEOC v. Arabian Am. Oil Co. (Aramco), 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (Title VII); The Apollon, 22 U.S. 362, 9 Wheat. 362, 6 L.Ed. 111 (1824) (Collection Act of 1799); United States v. Palmer, 16 U.S. 610, 3 Wheat. 610, 4 L.Ed. 471 (1818) (Act for the Punishment of Certain Crimes Against the United States); Rose v. Himely, 8 U.S. 241, 4 Cranch 241, 2 L.Ed. 608 (1808) (French condemnation laws). Additionally, in an earlier order published in this appeal, as well as in our earlier en banc opinion, Judge Kleinfeld dissented, as he does now, on the ground that the ATS applies to conduct only within the United States.
Our circuit has addressed this same issue once before. In In re Estate of Ferdinand Marcos, Human Rights Litig. (Marcos I), 978 F.2d 493, 499-501 (9th Cir. 1992), we considered an ATS claim based *745 on torture that took place in the Philippines. We categorically rejected the argument that the ATS applies only to torts committed in this country. We said, “we are constrained by what § 1850 shows on its face: no limitations as to the citizenship of the defendant, or the locus of the injury.” Id. at 500. In fact, the seminal and most widely respected applications of the statute relate to conduct that took place outside the United States. See Kadic v. Karadzic, 70 F.3d 232 (2d Cir.1995) (Bosnia-Herzegovina); Marcos I, 978 F.2d 493 (Philippines); Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980) (Paraguay). The D.C. Circuit has recently concluded that there is no bar to the ATS’s applicability to foreign conduct because the Supreme Court in Sosa did not disapprove these seminal decisions and Congress, in enacting the Torture Victim Protection Act, implicitly ratified such law suits. Doe v. Exxon Mobil Corp., 654 F.3d 11, 44-45 (D.C.Cir.2011); see also, Flomo v. Firestone Nat’l Rubber, Co., 643 F.3d 1013, 1016 (7th Cir.2011).
Moreover, we know from Sosa, that the Congress in 1789 had overseas conduct in mind. The Supreme Court in Sosa explained that when the Act was enacted, in 1789, piracy was one of the paradigmatic classes of cases recognized under the ATS. 542 U.S. at 724, 124 S.Ct. 2739; see also United States v. Smith, 5 Wheat. 153, 163-180, n.a, 5 L.Ed. 57 (1820) (cited favorably in Sosa, 542 U.S. at 732, 124 S.Ct. 2739) (illustrating the specificity with which the law of nations defined piracy). In fact, the North African Barbary Pirates were the scourge of shipping at the time of the ATS’s passage. Adrian Tinniswood, Pirates OF BARBARY: CORSAIRS, CONQUESTS, and Captivity in the 17th Century Mediterranean (2010). They roamed the Mediterranean region high-jacking trading vessels, enslaving them crews, and plundering their cargoes. Id. Their attacks against American ships gave rise to the creation of the U.S. Navy in 1794, shortly after the passage of the ATS. A.B.C. Whipple, to the Shores of Tripoli: The Birth of the U.S. Navy and Marines (1991, republished in 2001).
Morrison, upon which Judge Kleinfeld’s dissent predominantly relies, concerned the scope of § 10(b) of the Securities Exchange Act of 1934. It employed a “presumption against extraterritoriality” and tracked the presumption’s lineage to cases dating from 1932 onward. Id. at 2877-78 (citing Blackmer v. United States, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932); Foley Bros., Inc. v. Filardo, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949); Aramco, 499 U.S. 244, 111 S.Ct. 1227; Smith v. United States, 507 U.S. 197, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993); Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993)). There is no indication in Morrison, however, or elsewhere, that a “presumption against extraterritoriality” existed and could have been invoked by Congress in 1789.
The Court held in Morrison that § 10(b) did not apply to securities transactions conducted in other nations, stating that “[w]hen a statute gives no clear indication of an extraterritorial application, it has none.” 130 S.Ct. at 2878. Morrison, however, did not require that Congress use the precise word “extraterritorial” in a statute to establish such applicability. It required only that there be a “clear indication,” stating that such an indication may come from either the text or the context of the statute. Id. at 2883.
There is more than one “clear indication” of extraterritorial applicability in both the ATS’s text and its context. The ATS provides for jurisdiction “of any civil action by an alien ... committed in viola *746 tion of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350. The statute creates jurisdiction for claims brought by persons who are not citizens of this country. The statute’s explicit reference to the law of nations indicates that we must look beyond the law of the United States to international law in order to decide what torts fall under its jurisdictional grant. Piracy was one of the paradigmatic classes of cases recognized under the ATS when it was enacted. These are all indications of extraterritorial applicability.
In his dissent, Judge Kleinfeld acknowledges that Congress expressly intended to include claims of piracy within the ambit of the ATS. Nevertheless, he discounts such inclusion for purposes of the statute’s extraterritorial applicability. He states that while piracy occurs outside the United States, it takes place on the high seas, so there is no potential for interference with another nation’s sovereignty. He argues that, after Morrison, the express inclusion of piracy as a claim under the ATS can no longer support the statute’s extraterritorial application. Morrison, however, is very specific about the language of the Securities Exchange Act of 1934 and how it pertains to our own “national public interest.” It focuses on the domestic history of the implementation of § 10(b). Morrison describes Congress as generally enacting statutes that apply in our country, but says nothing about any concerns for the sovereignty of other nations. It provides no reasoning to undermine our conclusion that by recognizing an ATS claim for piracy, Congress intended extraterritorial application of the statute. Judge Kleinfeld accuses us of ignoring concerns about interference with national sovereignty. Yet, the Supreme Court in Sosa took such concerns fully into account when it held that ATS jurisdiction was limited to claims in violation of universally accepted norms. 542 U.S. at 727-28, 124 S.Ct. 2739.
Moreover, the ATS is a jurisdictional statute; federal courts frequently exercise jurisdiction with regard to matters occurring out of the country, subject to forum non conveniens and conflict of law principles. See Filartiga, 630 F.2d at 885 (“Common law courts of general jurisdiction regularly [have] adjudicate[d] transitory tort claims between individuals over whom they exercise personal jurisdiction, wherever the tort occurred.” (emphasis added)); see also Marcos I, 978 F.2d at 499-500 (rejecting the argument “that there is no extraterritorial jurisdiction over civil actions based on torture”). The norms being applied under the ATS are international, not domestic, ones, derived from international law. As a result, the primary considerations underlying the presumption against extraterritoriality—the foreign relations difficulties and intrusions into the sovereignty of other nations likely to arise if we claim the authority to require persons in other countries to obey our laws—do not come into play. This is because, Judge Kleinfeld’s contention notwithstanding, we are not asserting an entitlement to “make law” for the “entire planet.” Kleinfeld op. at 798. Instead, and especially in light of Sosa, the ATS provides a domestic forum for claims based on conduct that is illegal everywhere, including the place where that conduct took place. It is no infringement on the sovereign authority of other nations, therefore, to adjudicate claims cognizable under the ATS, so long as the requirements for personal jurisdiction are met.
The only circuit decision to apply Morrison in a case other than in a securities ease is Norex Petroleum v. Access Indus., 631 F.3d 29 (2d Cir.2010). It dealt with the Racketeer Influenced and Corrupt Organizations Act (RICO), enacted in 1970. There, the Second Circuit, in an amended *747 opinion, applied the Morrison presumption and dismissed a RICO action founded on conduct occurring in Russia. That decision was consistent with the Second Circuit’s precedent, as that circuit had earlier held that RICO had no extraterritorial application because it contained no language suggesting extraterritorial applicability. See North South Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2d Cir.1996), abrogated on other grounds by Norex.
We deal with the ATS, not RICO or a securities act. There are strong indications that Congress intended the ATS to provide jurisdiction for certain violations of international law occurring outside the United States, and there are no indications to the contrary. We therefore conclude that the ATS is not limited to conduct occurring within the United States or to conduct committed by United States citizens. The ATS, of course, expressly creates jurisdiction for claims asserted by aliens, so that there can be no dispute that claims may, indeed must, be asserted by entities that are not citizens of the United States.
There is no extraterritorial bar to applying the ATS to the conduct alleged in this case.
B. Corporate Liability
Defendants are all corporate entities, referred to collectively as Rio Tinto, and they contend that the ATS does not apply to corporations. We believe there are two separate but related inquiries with respect to corporate liability in this case. The first is whether, as Rio Tinto argues, the statute itself bars all corporate liability, and to the extent it applies to private actors, permits liability only as to individuals. The second is whether, if there is no overall statutory bar to corporate liability, the particular internationally accepted norm alleged to have been violated recognizes corporate liability. We deal, at this point, with the first, and more general inquiry.
Rio Tinto urges us to hold that the ATS bars corporate liability. This is a view that is to some extent supported by the recent Second Circuit majority opinion in Kiobel v. Royal Dutch Petroleum Co., holding that customary international law as' a whole “has not to date recognized liability for corporations that violate its norms.” 621 F.3d 111, 125 (2d Cir.2010). We, however, conclude the sounder view is that expressed in Judge Leval’s concurrence. Id. at 153 (Leval, J., concurring) (“No principle of domestic or international law supports the majority’s conclusion that the norms enforceable through the ATS— such as the prohibition by international law of genocide, slavery, war crimes, piracy, etc.—apply only to natural persons and not to corporations, leaving corporations immune from suit and free to retain profits earned through such acts.”).
In its brief, Rio Tinto looks principally to treaties establishing international tribunals for criminal trials—i.e. the Rome Statute and the Rwanda War Crimes Commission—which do not explicitly provide for corporate liability. The appropriate inquiry, however, is to look at the ATS itself and to the international law it incorporates. Sosa, 542 U.S. at 733, 124 S.Ct. 2739.
We have already recognized the importance of looking at the statutory language and purpose. Our circuit’s most recent decision on corporate civil liability in an international context is Bowoto v. Chevron, 621 F.3d 1116 (2010), where we held that the Torture Victim Protection Act’s express language and documented legislative history reflected congressional intent to limit liability under that statute to individuals. The statute created a civil action for *748 recovery of damages “from an individual,” id. at 1126, and the legislative history demonstrated that Congress considered and rejected corporate liability, id. at 1127.
The ATS contains no such language and has no such legislative history to suggest that corporate liability was excluded and that only liability of natural persons was intended. We therefore find no basis for holding that there is any such statutory limitation. This is also the view supported by a distinguished contemporary scholar, Harold Hongju Koh, Separating Myth from Reality About Corporate Responsibility Litigation, 7 J. Int’l Econ. L. 263, 266-67 (2004). The D.C. Circuit has recently reached the same conclusion. Doe, at *84.
With respect to whether corporate liability exists in any given ATS case, the most recent controlling Supreme Court decision is, of course, Sosa, which defines the scope of the ATS in terms of internationally accepted norms and frames the question of whether a particular defendant may be held liable in terms of the nature of the particular norm alleged to have been violated. In discussing the definite nature of an international norm required to invoke jurisdiction over a cause of action under the ATS, the Court noted:
A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual.
542 U.S. at 733 n. 20,124 S.Ct. 2739.
Sosa expressly frames the relevant international-law inquiry to be the scope of liability of private actors for a violation of the “given norm,” i.e. an international-law inquiry specific to each cause of action asserted. See id. (citing the Second Circuit’s decision in Kadic, 70 F.3d 232, where both the majority and the dissent applied international law principles, and citing the D.C. Circuit’s decision in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir. 1984), which also looks at international law). The proper inquiry, therefore, should consider separately each violation of international law alleged and which actors may violate it. Where no norm of international law sufficiently “specific, universal and obligatory” has been alleged to give rise to a cause of action, the ATS claim must be dismissed and we need not reach the question of corporate liability. Marcos II, 25 F.3d at 1475.
We therefore address the scope of liability for private actors, including corporate liability, with respect to those claims we conclude can allege a violation of a sufficiently established international norm. There is no legitimate basis for Rio Tinto’s position that the statute itself is a complete bar to corporate liability.
C. Aiding and Abetting Liability
In this court, although not below, Rio Tinto argues that the ATS does not encompass aiding and abetting liability. For purposes of considering this issue, we assume, without deciding, that the complaint alleges such liability with respect to the war crimes that could be said to have been committed by PNG with the aid of Rio Tinto. Like the inquiry into corporate liability, and for similar reasons, the inquiry into aiding and abetting liability is an international-law inquiry. See Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d 254, 268-77 (2d Cir.2007) (Katzmann, J. concurring) (“aiding and abetting liability, ... is sufficiently well established and universally recognized to be considered customary international law”) (citations, internal quotation marks, and alterations omitted).
The Second and Eleventh Circuits have recognized that aiding and abetting *749 may give rise to an ATS claim. Khulumani, 504 F.3d at 260; Romero v. Drummond Co., 552 F.3d 1303, 1315 (11th Cir. 2008) (“[T]he law of this Circuit permits a plaintiff to plead a theory of aiding and abetting liability under the Alien Tort Statute.”). As Judge Katzmann’s concurrence in Kfmlumani noted, in that case the United States conceded and the defendants did not dispute, the well-established international law concept of aiding and abetting. 540 F.3d at 270. The D.C. Circuit recently reached the same conclusion. Doe, at *29. We agree. The ATS itself does not bar aiding and abetting liability. In Part IV.B., we engage in the required international law inquiry and discuss the availability of aiding and abetting liability for war crimes.
D. Arising Under Jurisdiction
This is a case brought under the ATS, which is a law enacted by our First Congress. Judge Ikuta’s dissent argues, however, that federal courts under the ATS lack jurisdiction to adjudicate claims brought by an alien against an alien. In her view, in adjudicating claims under the ATS we are exercising foreign diversity jurisdiction and not dealing with a claim “arising under” the laws of the United States pursuant to Article III of the Constitution. Our circuit has addressed this same issue once before in Marcos I and concluded that ATS claims arise under federal law. 978 F.2d at 502-03. There, we held “that Congress had the power through the ‘Arising Under’ Clause of Article III of the Constitution to enact the Alien Tort Statute.” Id. Some eleven years later, we applied that precedent while sitting en banc in Alvarez-Machain v. United States, 331 F.3d 604, 612 (9th Cir.2003) (en banc), rev’d sub nom., Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Although Sosa reversed Alvarez-Machain, it did so on unrelated grounds, and did nothing to call into question the holding that we have jurisdiction to hear claims cognizable under the ATS because they “arise under” federal law for Article III purposes. Indeed, the best reading of Sosa is that it confirms our circuit law on this point, to which we adhere today.
Judge Ikuta’s dissent emphasizes Sosa’s characterization of the ATS as a jurisdictional statute. Although the Supreme Court in Sosa described the ATS as “jurisdictional in nature,” 542 U.S. at 713, 124 S.Ct. 2739, the Court rejected defendant’s argument that the ATS “does no more than vest the federal court with jurisdiction.” Id. Rather, the Court held “that federal courts could entertain claims once the jurisdictional grant was on the books, because torts in violation of the law of nations would have been recognized within the common law of the time.” See Sosa, 542 U.S. at 714, 124 S.Ct. 2739 (citing Brief of Professors of Federal Jurisdiction and Legal History as Amici Curiae in Support of Respondents, 2004 WL 419425). The Court said: “Although we agree the statute is in terms only jurisdictional, we think that at the time of enactment the jurisdiction enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law.” Id. at 712, 124 S.Ct. 2739.
Judge Ikuta’s repeated assertion that Sosa held that the ATS is “a purely jurisdictional statute” is thus misleading, omitting the nuance in the Sosa opinion. See Ikuta op. at 821, 828. What Sosa actually said is that although the statute is written as a grant of jurisdiction, it was understood at the time of its passage that the common law would provide a cause of action for violations of the law of nations or a treaty of the United States. See Sosa, 542 U.S. at 713-14, 124 S.Ct. 2739. In other words, Sosa holds that the ATS was enact *750 ed to provide jurisdiction to hear claims brought pursuant to causes of action that already existed at common law.
Of course, as Justice Scalia points out in Sosa, the “common law” at the time was “the so-called general common law,” and not federal law. Id. at 739, 124 S.Ct. 2739 (Scalia, J., concurring) (“General common law was not federal law under the Supremacy Clause.”). As one of our colleagues has explained, claims arising under the general common law did not arise under federal law or state law. “Federal and state courts adjudicating questions of general common law were not adjudicating questions of federal or state law, respectively—the general common law was neither.” William A. Fletcher, International Human Rights in American Courts, 93 Va. L. Rev. In Brief 1, 2 (2007) (“[B]y the early nineteenth century it had become clear that the general law, including the law of nations, was not federal law in either the jurisdiction-conferring or supremacy-clause sense.”).
But the concept of the “common law” changed dramatically after Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). After Erie, we no longer recognize a “general” common law as applicable in federal courts. Now, when federal courts decide claims arising under federal common law or federal statutes, they are applying federal law. As both the Sosa majority and Justice Scalia’s concurrence point out, following Erie “[tjhere developed a specifically federal common law.” Id. at 741, 124 S.Ct. 2739 (Scalia, J., concurring); see also id. at 726, 124 S.Ct. 2739 (maj. op.) (“Erie ... was the watershed in which we denied the existence of any federal ‘general’ common law....” (citation omitted)).
Most important for present purposes, there is no question that claims premised on federal common law arise under the law of the United States. See, e.g., Illinois v. City of Milwaukee, 406 U.S. 91, 100, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (“We see no reason not to give ‘laws’ its natural meaning, and therefore conclude that § 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin.” (citation omitted)); 19 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4514, 455 (2d ed.1996) (“A case ‘arising under’ federal common law presents a federal question and as such is within the original subject-matter jurisdiction of the federal courts.”).
Judge Ikuta’s dissent insists that even today, more than seventy years after Erie, cases brought pursuant to the ATS do not “arise under” the Constitution or laws of the United States for Article III purposes. In essence, she maintains that as a claim brought under the ATS would not have arisen under the laws of the United States for Article III purposes at the time the ATS was enacted—because, as we have explained, the cause of action would have been supplied by the “general” common law, which did not confer jurisdiction—it cannot do so now, even though the “general” common law no longer exists. Couching her argument in terms of Congressional intent, within the framework of the law in existence in 1789, Judge Ikuta ignores the subsequent development of the law that Sosa so clearly explained and endorsed taking into account. In fact, an entire subsection of the opinion (IV.B) was devoted to explaining why, despite the changed understanding of “the common law,” the judiciary retains the power, “subject to vigilant doorkeeping,” to recognize international norms as actionable under the ATS. Sosa, 542 U.S. at 729, 124 S.Ct. 2739. Although Sosa gave several reasons for this holding, most relevant to highlighting the degree to which it foreclosed Judge *751 Ikuta’s current argument is its response to Justice Scalia. Justice Scalia argued that the changes wrought by Erie “preclude federal courts from recognizing any further international norms as judicially enforceable today, absent congressional action.” Id. at 729, 124 S.Ct. 2739. The majority responded:
We think an attempt to justify such a position would be particularly unconvincing in light of what we know about congressional understanding bearing on this issue lying at the intersection of the judicial and legislative powers. The First Congress, which reflected the understanding of the framing generation and included some of the Framers, assumed that federal courts could properly identify some international norms as enforceable in the exercise of [ATS] jurisdiction. We think it would be unreasonable to assume that the First Congress would have expected federal courts to lose all capacity to recognize enforceable international norms simply because the common law might lose some metaphysical cachet on the road to modem realism.
Id. at 729-30, 124 S.Ct. 2739 (emphasis added).
Sosa went on to caution that it did not “imply that every grant of jurisdiction to a federal court carries with it an opportunity to develop common law.” Id. at 731 n. 19, 124 S.Ct. 2739. It rejected the argument that “the grant of federal-question jurisdiction [under 28 U.S.C. § 1331] would be equally as good” as the ATS, and for two reasons. Id. First, the ATS “was enacted on the congressional understanding that courts would exercise jurisdiction by entertaining some common law claims derived from the law of nations,” whereas federal question jurisdiction pursuant to § 1331 was not “extended subject to any comparable congressional assumption.” Id. Second, although “international disputes implicating ... our relations with foreign nations are one of the narrow areas in which federal common law continues to exist,” id. at 730, 124 S.Ct. 2739 (citation and quotation marks omitted, alteration in original), “a more expansive common law power related to 28 U.S.C. § 1331” might not be “consistent with the division of responsibilities between federal and state courts after Erie,” id. at 729 n. 19, 124 S.Ct. 2739. After Erie, the federal common law is developed only in “interstitial areas of particular federal interest.” Id. at 726, 124 S.Ct. 2739. In other words, § 1331 did not make the ATS superfluous, because only the ATS carries with it the Congressional assumption that the judiciary would use it to develop the common law in an area of particular federal interest: international relations.
In short, we read Sosa to permit courts to develop the federal common law by incorporating into it certain claims that derive from norms of international law— but only after determining that they meet the Sosa standards limiting those norms for ATS purposes. Sosa’s limitations on claims cognizable under the ATS, moreover, are themselves substantive federal law, just as the Foreign Sovereign Immunities Act (FSIA)’s statutory limitations on the sovereign immunity defenses available to foreign governments in American courts are substantive federal law. See FSIA, 28 U.S.C. § 1330(a); Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493-94, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (“At the threshold of every action in a District Court against a foreign state, ... the court must satisfy itself that one of the [FSIA’s] exceptions applies—and in doing so it must apply the detailed federal law standards set forth in the [FSIA], Accordingly, an action against a foreign sovereign arises under federal law, for purposes of Article III jurisdiction.”).
*752 Thus, it is by now widely recognized that the norms Sosa recognizes as actionable under the ATS begin as part of international law—which, without more, would not be considered federal law for Article III purposes—but they become federal common law once recognized to have the particular characteristics required to be enforceable under the ATS. See Fletcher, supra, at 8 (“[D]espite its lack of discussion, the Court’s decision necessarily implies that the federal common law of customary international law is jurisdiction-conferring.”); see also, e.g., Harold Hongju Koh, How Is International Human Rights Law Enforced?, 74 Ind. L.J. 1397, 1413 (1999) (describing this “legal internalization”); Harold Hongju Koh, Is International Law Really State Law?, 111 Harv. L. Rev. 1824, 1835 (1998) (same); see also Alvarez-Machain, 331 F.3d at 649-50 (O’Scannlain, J., dissenting) (“The ATS’s conformity with Article III rests on the incorporation of the law of nations as federal common law.”); Restatement (Third) op Foreign Relations § 111, cmt. e (1987) (“[Cjases arising under customary international law ... are ‘Cases ... arising under ... the Laws of the United States, and Treaties made ... under their Authority,’ and therefore within the Judicial Power of the United States under Article III, Section 2 of the Constitution.” (all but first alteration in original)).
The Supreme Court in Sosa put it this way: “[Fjederal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.” 542 U.S. at 732, 124 S.Ct. 2739. The clear implication of these instructions is that claims that meet this exacting standard are “recognize[d] ... under federal common law.” Id.; see also id. (recognizing that ATS claims are “private claims under federal common law for violations of ... international law norm[s]”); id. at 745 n. *, 124 S.Ct. 2739 (Scalia, J., concurring) (“[A] federal-common-law cause of action of the sort the Court reserves discretion to create would ‘arise under’ the laws of the United States ... for purposes of statutory federal-question jurisdiction.” (emphasis omitted)).
Judge Ikuta’s assertion that “international law is not itself part of the ‘Laws of the United States’ for purposes of Article III” is therefore not wrong, but it is incomplete. More accurately, it should state: The norms underlying international law torts are not itself part of the “Laws of the United States” for purposes of Article III until they have been incorporated into the federal common law pursuant to the exacting process articulated in Sosa.
Other aspects of Sosa confirm this conclusion. Sosa itself was a suit between two aliens. Two of the amicus briefs submitted on behalf of the respondent in Sosa pointed out the alleged Article III deficiency that Judge Ikuta asserts exists here. See Brief for the National Foreign Trade Council, et al., as Amici Curiae, 2004 WL 162760, at 24-25 (Jan. 23, 2004) (“Some ATS suits (including this one) feature aliens suing aliens—making the suits ineligible for federal diversity jurisdiction. For the suits to be maintainable, therefore, they would have to fall under another head of Article III jurisdiction—probably jurisdiction for ‘Cases ... arising under ... the Laws of the United States.’ But, ... international law itself, without some congressional action incorporating it into positive domestic law, is not law of the United States for Article III purposes. Reading the ATS as permitting suits based only on generalized international law, with no further specification by statute or treaty, would mean the statute attempted to provide jurisdiction well beyond the Article *753 III limits.” (citations omitted, emphasis in the original)); see also Brief of Washington Legal Foundation, et al. as Amici Curiae, 2004 WL 162759, at *14-19 (Jan. 23, 2004) (arguing that “a claimed violation of an international-law norm that has not been codified in a federal treaty or statute does not present a federal question or arise under federal law”).
The Sosa Court’s obvious awareness of the potential Article III problem, moreover, makes even more significant Sosa’s acknowledgment that the ATS will call upon the federal courts “to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits.” Sosa, 542 U.S. at 727, 124 S.Ct. 2739. The paradigmatic example of a suit that could “claim a limit on the power of foreign governments over their own citizens” is a case such as this one, where a foreign plaintiff is suing a foreign defendant for a tort committed in a foreign country. We are, of course, cognizant of Sosa’s warning regarding “the potential implications for the foreign relations of the United States of recognizing such causes,” id.—a concern that we address in Part III.B—but Sosa clearly contemplated that courts would at least have subject-matter jurisdiction, under appropriate circumstances, to hear cases brought under the ATS in which foreign plaintiffs allege that they have been wronged by their (foreign) governments. We are unwilling to assume, as Judge Ikuta apparently does, that the Sosa Court would warn us to be careful regarding the foreign-policy implications of hearing a type of case over which we lack subject matter jurisdiction entirely—particularly when the alleged jurisdictional defects of which Judge Ikuta complains were brought to its attention.
Others agree that Sosa stands for the proposition that claims cognizable under the ATS arise under the federal common law, and therefore provide subject matter jurisdiction. See Fletcher, supra, at 7-8 (explaining that, after Sosa, we know “that there is a federal common law of international human rights based on customary international law” and that “the federal common law of customary international law is federal law in both the jurisdiction-conferring and supremacy-clause senses”); see also, e.g., Khulumani, 504 F.3d at 265 (Katzmann, J., concurring) (explaining how “Sosa makes clear that all ATCA litigation is in fact based on federal common law, rather than a statutory cause of action”); id. at 286 (Hall, J., concurring) (“[A]l-though the substantive norm to be applied is drawn from international law or treaty, any cause of action recognized by a federal court is one devised as a matter of federal common law.” (quoting the Brief for the United States of America as Amicus Curiae at 5 (alteration in the original))); William R. Casto, The New Federal Common Law of Tort Remedies for Violations of International Law, 37 Rutgers L.J. 635, 638 (2006) (“Sosa squarely holds that ATS litigation is based upon a federal common law cause of action....”); Ernest A. Young, Sosa and the Retail Incorporation of International Law, 120 Harv. L. Rev. F. 28, 31, 33 (2007) (“Sosa is best read as recognizing a federal common law implied right of action for the violation of certain [customary international law] rules of decision ----[0]nce Sosa recognized a federal right of action, that recognition was sufficient to bring such claims within current understandings of Article Ill’s ‘arising under’ jurisdiction.”). .
To further support the proposition that the ATS does not arise under the laws of the United States, Judge Ikuta points out that admiralty law does not arise under the laws of the United States. Am. Ins. *754 Co. v. 356 Bales of Cotton, 26 U.S. 511, 545, 1 Pet. 511, 7 L.Ed. 242 (1828). Judge Ikuta, however, overlooks the reason. Admiralty law does not “arise under” federal law for Article III purposes because admiralty and maritime law have been carved out by the Supreme Court as special in this regard, for reasons wholly inapplicable to claims cognizable under the ATS. See Romero v. Intern’l Terminal Operating Co., 358 U.S. 354, 359-80, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959).
Article III has three specific grants of subject-matter jurisdiction. U.S. Const, art. III, § 2, cl. 1-3 (including cases arising under, cases affecting ambassadors, and cases of admiralty). In the seminal case upon which Judge Ikuta relies, Chief Justice Marshall reasoned that: “The Constitution certainly contemplates these as three distinct classes of cases; and if they are distinct, the grant of jurisdiction over one of them, does not confer jurisdiction over either of the other two.” 356 Bales of Cotton, 26 U.S. at 545. For that reason, as well as for reasons specific to notions of the “general common law” that no longer prevail, 356 Bales of Cotton held that “[a] case in admiralty does not, in fact, arise under the Constitution or laws of the United States.” Id.
In conclusion, the controlling decision of the Supreme Court, Sosa, and the overwhelming weight of scholarly authority all compel us to hold that an ATS case “arises under” the laws of the United States and calls for the exercise of federal question jurisdiction pursuant to Article III.
III. NONJUSTICIABILITY ISSUES
A. Prudential Exhaustion
This en banc court in the controlling plurality opinion by Judge McKeown “remanded for the limited purpose to determine in the first instance whether to impose an exhaustion requirement on plaintiffs” and in the same opinion outlined a framework. Rio Tinto III, 550 F.3d at 831-32. The opinion explained that “[t]he lack of a significant U.S. ‘nexus’ is an important consideration in evaluating whether plaintiffs should be required to exhaust their local remedies in accordance with the principle of international comity.” Id. at 831. It went on to point out that “[t]he nature of certain allegations and the gravity of the potential violations of international law” trigger America’s “historical commitment to upholding customary international law.” Id. The opinion expressly stated that prudential exhaustion “is not a prerequisite to jurisdiction” but is a principle that governs the timing of decision making. Id. at 828.
This is consistent with the Supreme Court’s observation in Sosa that exhaustion might be warranted when “appropriate” in ATS cases, 542 U.S. at 733 n. 21, 124 S.Ct. 2739, and led the plurality of this en banc court to observe that in ATS cases “[w]here the United States ‘nexus’ is weak, courts should carefully consider the question of exhaustion, particularly—but not exclusively—with respect to claims that do not involve matters of ‘universal concern.’ ” 550 F.3d at 824. The district court was bound by that directive, and, since the nexus of the claims to the United States was weak, concluded exhaustion was required for all claims other than those involving matters of universal concern. Rio Tinto IV, 650 F.Supp.2d at 1031.
Defendants now maintain in this appeal that the district court’s analytical framework on remand was flawed and that the district court did not consider the question of exhaustion with sufficient care. Defendants reason that if the district court had given the issue careful consideration it *755 would have concluded that exhaustion was required for all of the claims, essentially asserting that exhaustion is always required. This is not consistent with the controlling plurality’s view that the universality of the norm alleged to have been violated is a factor in determining whether exhaustion is required, and that all claims, including claims with a weak nexus to the United States should not, for exhaustion purposes, be treated the same. Rio Tinto III, 550 F.3d at 831.
The district court did not abuse its discretion when it considered whether exhaustion was required under the controlling plurality opinion of this court. The controlling rationale of our prior en banc decision did not require dismissal of the entire action for failure to exhaust.
B. Political Question, International Comity, Act of State
Courts have long been hesitant to decide issues that might infringe upon the conduct of the Executive Branch and hence have been concerned about what are characterized as “political questions.” The doctrine “derives from the judiciary’s concern for its possible interference with the conduct of foreign affairs by the political branches of the government.” DeRoburt v. Gannett Co., 733 F.2d 701, 703 (9th Cir.1984). The district court originally dismissed all claims in this case as nonjusticiable political questions, relying on the initial position taken by the United States Department of State that interference with our relations with PNG might result from adjudication. Rio Tinto I, 221 F.Supp.2d at 1193-1199, 1208-09. Cases raising political questions are nonjusticiable. Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 170, 2 L.Ed. 60 (1803).
Courts considering the political question doctrine begin with Baker v. Carr, in which the Supreme Court described the doctrine as a function of the separation of powers and set forth six factors that require the dismissal of a suit under the political question doctrine if any one of them is “inextricable from the case at bar.” 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Rio Tinto argues that four of the six Baker factors are at issue here:
1. “a textually demonstrable constitutional commitment of the issue to a coordinate political department”;
* * *
4. “the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government”;
5. “an unusual need for unquestioning adherence to a political decision already made”; or
6. “the potentiality of embarrassment from multifarious pronouncements by various departments on one question.”

Id.

We will address each of these factors in turn and must, if any is inextricable from the case, dismiss the entire action as nonjusticiable. See Corrie v. Caterpillar, Inc., 503 F.3d 974, 980 (9th Cir.2007).
In evaluating whether this ease involves matters submitted to another branch, the first Baker factor, we are mindful that the conduct of foreign policy is not the role of the courts. In this case, “we are not faced with analyzing a specific clause of the Constitution but rather proceed from the understanding that the management of foreign affairs predominantly falls within the sphere of the political branches and the courts consistently defer to those branches.” Alperin v. Vatican Bank, 410 F.3d 532, 549 (9th Cir.2005). The political question inquiry “is a case-by-case inquiry because it is error to suppose *756 that every case or controversy which touches foreign relations lies beyond judicial cognizance.” Id. (citations and quotation marks omitted).
Congress expressly enacted the ATS to provide a forum for resolution of tort claims. The law to be applied emanates from international sources, and its application could call into question the actions of other nations in a way that could affect our foreign relations. This case, however, in no way calls upon the courts to judge the conduct of foreign relations by the United States government. The United States was not directly or indirectly involved in any of the events that occurred in PNG. This is not a case like Come in which the United States government financed the conduct plaintiffs sought to challenge. See 503 F.3d at 982 (explaining that the political question doctrine bars jurisdiction where the case would “at least implicitly” require the court to pass judgment on United States foreign policy). Nor does the fact that we must look to international law create a political question. See Deutsch v. Turner Corp., 324 F.3d 692, 713 n. 11 (9th Cir.2003) (explaining that the application of treaty law does not automatically raise a nonjusticiable question). An ATS suit, such as this one, requires courts to apply the law of nations, as manifested in customary international law integrated into the United States’ common law.
The fourth, fifth and sixth Baker factors are relevant in an ATS case “if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests.” Kadic, 70 F.3d at 249. Since the facts of this case present no question regarding the actual conduct of United States foreign policy, if there is any lack of respect due coordinate branches it must concern the executive’s foreign policy interests related to this case. In asking whether adjudication of this matter would display a lack of respect for coordinate branches, we must ask whether another branch has taken any action that could be jeopardized by our exercise of jurisdiction over this case.
The United States Department of State originally submitted a Statement of Interest (SOI) which concluded that “continued adjudication of the claims ... would risk a potentially serious adverse impact on the peace process, and hence on the conduct of our foreign relations.” The State Department was primarily concerned that adjudication of this case could invalidate acts of reconciliation that had already occurred in the war between PNG and the people of Bougainville and would “sweep away the basis of the peace agreement.” The SOI also noted the PNG’s strong objection to these proceedings. Thus, in response to Plaintiffs’ original appeal, Rio Tinto supported the dismissal of the suit by arguing that there would be interference with U.S. foreign relations and relied on the SOI. When this en banc court remanded to consider prudential exhaustion, it did not expressly consider the issue. Rio Tinto III, 550 F.3d 822. We now do.
The political situation has significantly changed since the district court originally heard this case. Neither the PNG nor the US government now oppose the litigation going forward. In fact, in a letter sent on May 26, 2009, the PNG expressly urged that the case “be heard by courts in the United States” explaining that the Bougainville Government does “not see the case ... adversely affecting any relations between us and [the] United States.” The US government, for its part, has told this court in its briefs that it no longer believes foreign policy concerns are material in this *757 case and has expressly stated that it is not “seeking dismissal of the litigation based on purely case-specific foreign policy concerns.” Thus, there is no longer any basis for a fear of interference by the courts in the conduct of foreign affairs.
This case presents exactly the types of questions that courts are well-suited to resolve: whether actions were lawful under specific and obligatory laws, whether the defendants are responsible for such actions, and whether the plaintiffs are entitled to relief. The political question doctrine is thus no bar to our exercise of jurisdiction.
Rio Tinto has also argued that all of Plaintiffs’ claims are barred by the international comity doctrine, but that argument fails for similar reasons. Comity is rooted in international relations. “Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states.” Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa, 482 U.S. 522, 544 n. 27, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987). It is out of that very spirit of cooperation and deference to tribunals in other nations that we held exhaustion may be a prudential bar to certain claims under the ATS. Rio Tinto III, 550 F.3d at 828-31. In particular, we instructed the district court to evaluate “whether plaintiffs should be required to exhaust their local remedies in accordance with the principle of international comity.” Id. at 831.
The district court’s consideration of exhaustion was sufficient to alleviate comity concerns. In considering whether exhaustion was required, the district court considered the universality of the norm and the nexus (or lack thereof) to the United States. Rio Tinto IV, 650 F.Supp.2d at 1014-31. In holding that the jus cogens violations alleged do not require exhaustion, the district court balanced the multiple concerns animating the comity doctrine. Id. at 1030-31.
The district court’s earlier dismissal on comity grounds was predicated in large part on PNG’s opposition. Rio Tinto I, 221 F.Supp.2d 1116, 1199-1204. Such opposition is no longer present, and, in fact, the government of PNG has expressed its position that this action should go forward. Sarei v. Rio Tinto, 625 F.3d 561 (9th Cir.2010). In light of both the exhaustion analysis conducted by the district court and the position of the PNG government, we conclude that comity does not bar any of the claims.
Finally, Rio Tinto argues that the act of state doctrine requires dismissal of Plaintiffs’ claims. This argument also fails. “The act of state doctrine ... precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.” Banco Nacional de Cuba, 376 U.S. at 401, 84 S.Ct. 923. However, jus cogens norms are exempt from the doctrine, since they constitute norms “from which no derogation is permitted.” Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 714 (9th Cir.1992) (quoting the Vienna Convention on the Law of Treaties) (internal quotations omitted); see id. at 718 (holding a violation of a jus cogens norm is not a sovereign act). Thus, Plaintiffs’ claims that allege jus cogens violations are not barred by the act of state doctrine.
IV. THE SPECIFIC CLAIMS THE DISTRICT COURT HELD WERE MATTERS OF UNIVERSAL CONCERN
We turn to the specific claims that the district court determined were within the *758 jurisdiction of the ATS as alleged in Plaintiffs’ complaint. They are genocide, war crimes, crimes against humanity, and racial discrimination. As a threshold matter, we explain why we consider genocide and crimes against humanity separately.
The complaint, the district court decisions, and other ATS decisions have often conflated consideration of genocide and crimes against humanity. See Rio Tinto I, 221 F.Supp.2d at 1149-51; see also Kiobel, 621 F.3d at 112. Genocide and crimes against humanity, however, are distinct under international law and should be considered separately. The statute of every modern international criminal tribun.1 has included separate articles for genocide and crimes against humanity (not, for example, making genocide a sub-section of the article prohibiting crimes against humanity). See The Rome Statute of the International Criminal Court (Rome Statute), arts. 6-7, opened for signature July 17, 1998, 37 I.L.M. 1002; Statute of the International Criminal Tribunal for the former Yugoslavia (ICTY Statute), arts. 4-5; Statute of the International Criminal Tribunal for Rwanda (ICTR Statute), arts. 2-3. In addition, the Genocide Convention makes no mention of crimes against humanity. See Convention on the Prevention and Punishment of the Crime of Genocide (Genocide Convention), Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277. The elements of each violation under international law are therefore different; for that reason we consider each separately.
A. Genocide
The complaint alleges genocide against the indigenous population of the island of Bougainville in violation of the Convention on the Prevention and Punishment of the Crime of Genocide.
1. The prohibition against genocide is a specific, universal, and obligatory internationally accepted norm.
The concept of genocide as an internationally accepted norm was a product of World War II. Genocide was first defined in 1948 in the Genocide Convention as “any of the following acts committed with intent to destroy, in whole or in part, a national, ethnic[], racial or religious group, as such:”
(a) Killing members of the group;
(b) Causing serious bodily or mental harm to members of the group;
(c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;
(d) Imposing measures intended to prevent births within the group;
(e) Forcibly transferring children of the group to another group.
Genocide Convention, art. II.
The United States ratified the Convention, although without a declaration as to whether or not the treaty was self-executing. This approach was in contrast to that taken with regard to ratification of the Convention on the Elimination of Racial Discrimination, which contained a declaration that it was not self-executing. See Genocide Convention Implementation Act of 1987, 18 U.S.C. § 1091 et seq. The Genocide Convention Implementation Act of 1987 incorporated the Genocide Convention’s definition, with minor differences in language that are not significant. 18 U.S.C. § 1091(a). The Act included a provision, cited by Justice Scalia in his Sosa concurrence, that it should not “be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding.” 542 U.S. at 749, 124 S.Ct. 2739 (Scalia, J. concurring) (quoting 18 U.S.C. § 1092). This did not, *759 however, affect the availability of an ATS claim. As the Second Circuit has noted, the “decision not to create a new private remedy” does not repeal the pre-existing remedy under the ATS. Kadic, 70 F.3d at 242 (emphasis added).
Accordingly, even accepting Justice Scalia’s argument that the treaty ratification itself did not create a remedy, the status of genocide as a jus cogens norm remains indisputable. See, e.g., Restatement Third, §§ 404, 702, Siderman de Blake, 965 F.2d at 717. Genocide has been criminalized by all of the international criminal tribunals. Rome Statute, art. 6; ICTY Statute, art. 4; ICTR Statute art. 2. The Genocide Convention has been ratified by more than 140 nations. U.S. Department of State, Treaties in Force (2010). The Convention itself makes clear the non-derogable nature of the prohibition by establishing that “constitutional rulers,” among other parties, may be punished for genocide and that the prohibition applies irrespective of peace or war. Genocide Convention, arts. I, IV. The International Court of Justice (ICJ) reiterated that the prohibition on genocide is a jus cogens norm in a 2007 opinion. Bosnia and Herzegovina v. Serbia, 2007 I.C.J. 91, ¶ 161 (Feb. 26).
In addition, the jus cogens norm prohibiting genocide is sufficiently specific to give rise to an ATS claim. The definition of genocide was first articulated in the Genocide Convention, quoted above, but it has been repeatedly reaffirmed in international and domestic law since 1948. Notably, the Convention’s definition has been incorporated, with insignificant modifications, into domestic law in the form of the Genocide Convention Implementation Act of 1987. See 18 U.S.C. § 1091(a). One-hundred and forty other nations have agreed upon this definition of genocide. Dep’t of State, Treaties in Force (2010). International tribunals have, with uniformity, applied the same definition. Rome Statute, art. 6 (criminalizing genocide); ICTY Statute, art. 4 (same); ICTR Statute, art. 2 (same).
Claims of genocide, therefore, fall within the limited category of claims constituting a violation of internationally accepted. norms for ATS jurisdiction. Sosa, 542 U.S. at 729, 124 S.Ct. 2739. They are not barred by the act of state doctrine because violations of jus cogens norms are not sovereign acts. See Siderman de Blake, 965 F.2d at 718. Rio Tinto does not contend otherwise.
2. The jus cogens prohibition of genocide extends to corporations.
Having determined that the jus cogens prohibition of genocide is sufficiently specific, universal, and obligatory to give rise to an ATS claim, we must next consider whether the forms of liability alleged in the complaint are cognizable in such an action. We have, in Section II.B supra, already rejected Rio Tinto’s contention that the ATS itself bars corporate liability across the board.
Article IX of the Genocide Convention provides that contracting parties may submit disputes to the ICJ “including those relating to the responsibility of a State for genocide or any of the other acts enumerated in article III.” Genocide Convention, art. IX. The ICJ has made it explicitly clear that a state may be responsible for genocide committed by groups or persons whose actions are attributable to states. Bosnia and Herzegovina, 2007 I.C.J. at ¶ 167. This clarity about collective responsibility implies that organizational actors such as corporations or paramilitary groups may commit genocide. Given the universal nature of the prohibition, if an actor is capable of committing genocide, that actor can necessarily be held liable for *760 violating the jus cogens prohibition on genocide. Indeed, the implication that an actor may avoid liability merely by incorporating is inconsistent with the universal and absolute nature of the prohibition against genocide. See Kiobel, 621 F.3d at 149-153 (Leval, J. concurring).
The ICJ has so recognized. Examining the treaty and other sources of customary international law in 2007, the ICJ held “Contracting Parties to the Convention are bound not to commit genocide, through the actions of their organs or persons or groups whose acts are attributable to them.” Bosnia and Herzegovina, 2007 I.C.J. ¶ 167. The ICJ acknowledged that the Convention did not explicitly provide for direct state responsibility for the commission of genocide, but held “[i]t would be paradoxical if States were thus under an obligation to prevent, so far as within their power, commission of genocide by persons over whom they have certain influence, but were not forbidden to commit such acts through their own organs, or persons over whom they have such firm control that their conduct is attributable to the State concerned under international law.” Id. at ¶ 166.
Corporations are recognized legal entities, yet, according to the ICJ, even amorphous “groups” may be guilty of genocide. The ICJ’s analysis is instructive, in particular because the Supreme Court has noted that “[i]n interpreting our treaty obligations, we ... consider the views of the ICJ itself, ‘giving respectful consideration to the interpretation of an international treaty rendered by an international court with jurisdiction to interpret the treaty.’ ” Medellin v. Texas, 552 U.S. 491, 513 n. 9, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (quoting Breará v. Greene, 523 U.S. 371, 375, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (per curiam)). The ICJ concluded that genocide is a violation of international law whether committed by an individual, an amorphous group, or a state, consistent with all other sources of international law recognizing the universality of the prohibition of genocide. See Bosnia and Herzegovina, 2007 I.C.J. at ¶ 417 (attributing the genocide in Srebrenica to “persons and groups of persons”).
The ICJ made explicitly clear that a state may be responsible for genocide committed by groups or persons whose actions are attributable to states. Id. at ¶ 167 (Feb. 26). Under this holding, loosely affiliated groups such as paramilitary units may commit genocide, particularly in light of consistent case law indicating that genocide does not require state action. See id. (attributing genocide to a non-state actor); see also Kadic, 70 F.3d at 241-44. Given that an amorphous group, a state, and a private individual may all violate the jus cogens norm prohibiting genocide, corporations likewise can commit genocide under international law because the prohibition is universal. See Genocide Convention, Preamble (“[Gjenocide is a crime under international law, contrary to the spirit and aims of the United Nations and condemned by the civilized world.”).
We recognize that this holding puts us at odds with the Second Circuit majority in Kiobel. See 621 F.3d at 120. We, like the Second Circuit, have also taken guidance for our analysis from a footnote in Sosa and asked “whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued.” Kiobel, 621 F.3d at 120 (quoting Sosa, 542 U.S. at 732 n. 20, 124 S.Ct. 2739). The Second Circuit majority looked to whether any international institution had held a corporation liable for war crimes. See 621 F.3d at 119; 131-45. We, however, believe the proper inquiry is not whether there is a specific precedent so holding, but whether international law *761 extends its prohibitions to the perpetrators in question. After Sosa we must look to congressional intent when the ATS was enacted. Congress then could hardly have fathomed the array of international institutions that impose liability on states and non-state actors alike in modern times. That an international tribunal has not yet held a corporation criminally liable does not mean that an international tribun.1 could not or would not hold a corporation criminally liable under customary international law. See Jonathan A. Bush, The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said, 109 Colum. L. Rev. 1094, 1149-68 (2009) (exploring strategic decision not to prosecute corporations at Nuremberg trials, after determining that such prosecutions would have been available under a variety of theories); cf. The Nuremberg Trial, 22 Trial of the Major War Criminals Before the International Military Tribunal 501-17 (proceedings of Sept. 30, 1946) (declaring the Nazi Leadership Corps, Die Geheime Staatspolizei (Gestapo) and Der Sicherheitsdienst des Reichsführer SS (SD) (which were indicted together), and Die Schutzstaffeln der National-sozialistischen Deutschen Arbeiterpartei (SS) to be criminal organizations). We cannot be bound to find liability only where international fora have imposed liability. Moreover, both the District of Columbia and the Seventh Circuits have very recently upheld imposition of civil liability on corporations under the ATS. Doe, 654 F.3d at 18-19; Flomo, 643 F.3d at 1018-19. Both courts noted that, while I.G. Farben was not criminally prosecuted after World War II, it was dissolved and it’s assets seized. Doe, 654 F.3d at 52-53; Flomo, 643 F.3d at 1020-21. Corporate identity is no bar to liability under the ATS.
3. The complaint adequately alleges a claim of genocide.
We turn, then, to whether the complaint sufficiently alleges facts supporting a claim of genocide. Plaintiffs’ complaint includes allegations of killing, serious bodily harm, and the deliberate infliction of conditions of starvation “for the purpose of starving the bastards out.” The complaint alleges that Rio Tinto called in military force so that it could wipe out the native inhabitants of Bougainville engaged in an uprising. Such acts are prohibited by the Genocide Convention. Genocide Convention, art. 11(a), (b), and (c) (prohibiting “(a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part” with the intent to destroy a protected group). The complaint therefore alleges facts supporting an inference of acts that could constitute genocide.
To support a claim for genocide, however, the acts listed in Art. II of the Genocide Convention must additionally be committed with “intent to destroy, in whole or in part, a national, ethnie[ ], racial, or religious group, as such.” Genocide Convention, art. I. The definition of a protected group under the Genocide Convention does not protect groups of persons generally, such as groups of people who find themselves under attack for political opinion reasons because they are in the wrong place at the wrong time. As one Trial Chamber Judgment at the International Criminal Tribunal for the Former Yugoslavia (ICTY) concluded, “the Genocide Convention does not protect all types of human groups. Its application is confined to national, ethnic[], racial, or religious groups.” Prosecutor v. Krstic, Case *762 No. IT-98-33-T, Judgment, ¶¶ 554-59 (Aug. 2, 2001).
In a decision holding that Serbia violated international law by failing to prevent genocide, the ICJ also considered the definition of a “protected group” for purposes of the Genocide Convention. Bosnia and Herzegovina, 2007 I.C.J. at ¶¶ 193-196. This case serves as an instructive frame of reference. The ICJ held that to qualify as a protected group, the group “must have particular positive characteristics—national, ethnie[], racial or religious—and not the lack of them.” Id. at ¶ 193. It held “Bosnian Muslims” constituted a protected group under the Convention, but that the negative definition of a group (“non-Serbs”) did not constitute a protected group. Id.
In holding that “non-Serbs” could not constitute a protected group, the court emphasized that there must be a collective “group identity” that is sought to be destroyed. Id. at ¶ 193. Accordingly, in an ethnically-diverse environment, like the one existing in the town of Srebrenica, the intent to eradicate any person who did not belong to the preferred group did not amount to the targeting of a specific group, which is the essence of genocide. Id. at ¶ 191. The decision went on to point to the drafters’ rejection of proposals to include political groups as illustrating the drafters’ “close attention to the positive identification of groups with specific distinguishing well-established, some said immutable, characteristics.” Id. at ¶ 194.
The general allegations of the complaint in this case describe in vivid detail the turmoil between the native inhabitants of the island and Rio Tinto, which led to the closure of the mine by the local residents in protest over the environmental destruction wrought by it. The complaint concludes its description of the events leading to the closure of the mine by asserting that “Bougainville is the first place in the world where an indigenous people have forced the closure of a mine that was raping the land and an environment, and have kept it closed.” The complaint goes on to describe the acts of violence and mayhem intentionally inflicted by Rio Tinto after its summoning of military force.
The complaint here amply shows why the residents of Bougainville constitute a protected group. The complaint defines the residents of Bougainville by reference to their “native way of life,” ancestral attachment to the land, distinct culture, and black skin color. Moreover, the complaint alleges that both Rio Tinto and the PNG government saw the residents of Bougainville as a distinct group. See Compl. (“Rio considered the native people to be inferior in every respect: socially, economically, politically, and racially.”); id. (quoting “the former commander of the PNG forces,” referring to the residents of Bougainville as a “ ‘distinctive people’ ”); see also Bosnia and Herzegovina, 2007 I.C.J. art 191 (noting that “international jurisprudence accepts a combined subjective-objective approach to defining a protected group,” allowing for definition both by the group itself and by outsiders). The complaint thus adequately alleges that Bougainvilleans possessed “particular positive characteristics” and “particular group identity,” Bosnia and Herzegovina, 2007 I.C.J. at ¶ 193, both in their own eyes and in the eyes of others.
These allegations are more than enough to support the Bougainvilleans’ status as a protected group for the purpose of their genocide claim. This is true no matter whether they allege the shared “social ... and cultural” characteristics that comprise an ethnic identity, see David L. Nersessian, The Razor’s Edge: Defining and Protecting Human Groups Under the Genocide Convention, 36 Cornell Int’l L.J. *763 293, 300 (2003) (citing “the travaux preparatoires of the Genocide Convention”), or shared physical characteristics sufficient to constitute an identifiable “racial” group, or a hybrid of these or the other protected elements. As the ICTY has explained: “National, ethnical, racial or religious group[s] are not clearly defined in the [Genocide] Convention or elsewhere.... [S]etting out such a list was designed more to describe a single phenomenon ... than to refer to several distinct prototypes of human groups.” Krstic, ¶¶ 555-56. Plaintiffs have adequately alleged both ethnic and racial traits sufficient to make them a protected group.
Moreover, according to the complaint, Rio Tinto oversaw this mass infliction of death and suffering as a part of its pattern of behavior on account of its worldwide view that members of non-white races were “expendable.” Thus, the complaint alleges that this was Rio Tinto’s worldwide modus operandi: “Rio’s treatment of the Bougainville people and the environment was a part of a pattern of behavior it has perpetrated throughout the world where it has regarded the non Caucasian indigenous people who live in the areas in which it is exploiting natural resources as racially inferior and expendable.”
Although the complaint’s use of the term “non Caucasian” might be read to conflict with Bosnia and Herzegovina’s suggestion that protected groups must be defined in positive rather than negative terms, 2007 I.C.J. at ¶ 193, any conflict here is illusory, given the complaint’s extensive allegations as to the “positive characteristics,” id., of the people of Bougainville. As in Bosnia and Herzegovina, the complaint’s use of the negative identifier is “very limited,” id. at ¶ 196. The complaint overwhelmingly describes Bougainvilleans by reference to their own characteristics, rather than by contrast to characteristics they did not possess.
Thus, the killings of the native people of the island were committed on account of their race at least in part, and committed with “intent to destroy in whole or in part a national, ethnic[ ], racial or religious group, as such” within the meaning of Article I of the Genocide Convention. The target was the indigenous population of the previously pristine and isolated island of Bougainville, whose members had previously had “only the vaguest contact with the modern world,” who were non-white, and who shared a homogenous racial identity. The allegations are sufficient to constitute genocide with respect to the Islanders. Even though the complaint alleges that Rio Tinto harbored virtually global racial animosity toward non-white indigenous peoples, the existence of animosity toward similar groups throughout the world cannot negate the legal consequences of an attempt to destroy a specific protected group in a particularized place.
The complaint adequately alleges a claim of genocide. The district court’s original dismissal of the claim must be reversed.
B. War Crimes
The complaint alleges war crimes—in the form of murder—against the civilian population of Bougainville during a non-international armed conflict in violation of Common Article III of the Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Common Article III).
1. The prohibition against war crimes is a specific, universal, and obligatory internationally accepted norm.
War crimes are defined primarily by the Geneva Conventions, to which the United States, along with at least 180 na *764 tions, is a party and which constitute part of customary international law. See, e.g., Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101-30, at 15 (1990) (“[T]he Geneva Conventions, to which the United States and virtually all other countries are Parties, ... generally reflect customary international law.”). War crimes are also among the crimes of “universal concern” in Restatement (Third), § 404.
War crimes, regrettably, continue to have an all too contemporary resonance. A district court in Virginia has recently recognized the status of war crimes as sufficiently specific, obligatory, and universal to give rise to a cause of action under the ATS:
Claims for violations of the international norm proscribing war crimes are cognizable under the ATS. By ratifying the Geneva Conventions, Congress has adopted a precise, universally accepted definition of war crimes. Moreover, through enactment of a separate federal statute, Congress has incorporated this precise definition into the federal crimin.1 law. 18 U.S.C. § 2441. Thus, Congress has clearly defined the law of nations to include a binding prohibition on the commission of war crimes. Given this, and given Sosa’s teachings, it follows that an allegation of a war crime states a cause of action under the ATS.
In re Xe Servs. Alien Tort Litig., 665 F.Supp.2d 569, 582 (E.D.Va.2009).
The definition of war crimes found in Common Article III has been agreed to by the United States and more than 180 nations party to the Geneva Convention. Common Article III provides, in relevant part:
In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:
(1) Persons taking no active part in the hostilities ... shall in all circumstances be treated humanely, without any adverse distinction founded on race, col-our. ...
To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:
(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture....
Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War, art. 3, Oct. 21, 1950, 75 U.N.T.S. 287 (Geneva IV). Like the provisions in international law defining genocide, this definition is sufficiently specific, obligatory, and universal to give rise to an ATS claim. Defendants do not contend otherwise.
2. International law recognizes corporate liability for war crimes.
With respect to corporate liability for war crimes, at least two district courts have found that corporations may be liable for war crimes under the ATS. In re Xe Servs. Alien Tort Litig., 665 F.Supp.2d 569; Wissam Abdullateff Sa’eed Al-Quraishi v. Adel Nakhla, 728 F.Supp.2d 702, 744 (D.Md.2010) (“The Fourth Geneva Convention does not limit its application based on the identity of the perpetrator of the war crimes. Rather, its protections are based on who the potential victims of war crimes are.”).
The text of Common Article III binds “each Party to the conflict.” Geneva IV, art. III. Because parties to a conflict not of an international character by definition must include at least one non-state actor, *765 entity, or group, Common Article III cannot reasonably be interpreted to be limited to states. The universal, obligatory, and specific nature of the jus cogens prohibition on war crimes is analogous to the jus cogens norm prohibiting genocide in its inclusion of states, individuals, and groups within its prohibition. Like the Genocide Convention, and to an even greater degree, Common Article III to the Geneva Conventions focuses on the specific identity of the victims rather than the identity of the perpetrators.
The Eleventh Circuit has noted that corporations may be liable under the ATS for war crimes claims. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1263 (11th Cir. 2009). We agree and conclude that international law extends the scope of liability for war crimes to all actors, including corporations.
3. International law recognizes aiding and abetting liability for war crimes.
Criminal aiding and abetting liability for war crimes has been clearly established by the war crimes tribunals. See, e.g., Prosecutor v. Kvocka, Case No. IT-98-30/1-T, Judgment (Nov. 2, 2001) (holding an individual responsible for aiding and abetting war crimes pursuant to the joint criminal enterprise doctrine); Prosecutor v. Musema, Case No. ICTR96-13-T, Judgment (Jan. 27, 2000). See also ICTY Statute art. 7(1) (providing for aiding and abetting liability for all crimes in its jurisdiction, including crimes against humanity and war crimes); ICTR Statute art. 6(1) (same); Rome Statute art. 25(3)(c) (same).
Under international law, however, the required mens rea for aiding and abetting war crimes is subject to dispute. On the one hand, as Amici International Law Scholars describe, the Nuremberg-era trials, the ICTY, and the ICTR have required the mens rea of knowledge in aiding and abetting cases. Brief of Amici Curiae International Law Scholars in Support of Plaintiffs-Appellants at 4-16 (Feb. 18, 2010) (citing, among other cases, United States v. Von Weizsaecker (The Ministries Case), 14 Trials of War Criminals Before the Nuremberg Military Tribunals under Control Council Law No. 10 (1949), Prosecutor v. Furundzija, Case No. IT-95-17/1/T, Judgment, ¶ 236 (Dec. 10,1998), Prosecutor v. Rutaganda, Case No. ICTR-96-3-T, Judgment, ¶ 389-91, 416, 439 (Dec. 6, 1990)). On the other hand, the Rome Statute, art. 25(3)(c) states that aiding and abetting must be “for the purpose” of furthering the crime. See Doe, 654 F.3d at 70-71. In accord with the Rome Statute, Judge Katzmann’s concurrence in Khulumani concluded that aiding and abetting under international law requires the mens rea of purpose and the actus reus of “substantial assistance.” Khulumani, 504 F.3d at 277 (Katzmann, J. concurring). See also Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 259 (2d Cir.2009) (stating that the mens rea for aiding and abetting liability under the ATS is purpose and the actus reus is “practical assistance to the principal which has a substantial effect”).
We need not resolve this dispute as to mens rea in order to conclude that customary international law gives rise to a cause of action for aiding and abetting a war crime under the ATS. It is absolutely clear, as a matter of international law, that at least purposive action in furtherance of a war crime constitutes aiding and abetting that crime. Allegations of such purposive action are therefore cognizable under the ATS. See Sosa, 542 U.S. at 732, 124 S.Ct. 2739. We reserve decision as to whether, as Judge Pregerson suggests, al *766 legations of knowledge but not purpose in aiding or abetting the commission of war crimes would also be cognizable under Sosa.
4. The complaint adequately alleges a war crimes claim.
The complaint alleges murder of civilians during the civil war between the people of Bougainville and the PNG, conduct which is clearly prohibited under Common Article III(l)(a) of the Fourth Geneva Convention. The complaint alleges that Rio Tinto induced the military action and intended such action, “to forcibly displace and destroy plaintiffs and members of the Class.” According to Plaintiffs, Rio Tinto “understood and intended” that their actions would “likely result in military action by the PNG and intended such action to take place even if it meant the death and/or injury of residents.” Plaintiffs also allege that Rio Tinto “understood that it had a great deal of the control over the situation” and “knew” that this was the only way it could reopen its profitable mine. Plaintiffs allege that Rio Tinto solicited the military action for its own private ends and directed the military response even “while reports of war crimes surfaced.”
Judge McKeown suggests that Plaintiffs do not allege Rio Tinto’s specific intent to harm the residents of Bougainville. “Missing,” she says, “is the link between Rio Tinto and the PNG’s alleged war crimes.” McKeown op. at 792. But Judge McKeown ignores Plaintiffs’ extensive allegations that Rio purposely induced the war crimes in order to protect its economic interests in PNG. Plaintiffs allege that Rio issued the PNG government “an ultimatum”: displace the local residents interfering with its mining operations, no matter the means, or Rio would abandon all investments on PNG. When the PNG government employed military means to fulfill Rio’s demands, Plaintiffs allege, Rio provided the PNG military helicopters and vehicles to carry out the operations, even after reports of war crimes became public. When initial efforts were insufficient to displace the locals, PNG imposed a blockade on Bougainville; Plaintiffs allege that at a meeting “between PNG officials and two top Rio executives, one top Rio manager encouraged continuation of the blockade to ‘starve the bastards out....’” Moreover, Rio allegedly assured the PNG government that the continued maintenance of the blockade was enough to prevent Rio from withdrawing from PNG, while Rio simultaneously attempted to repress reporting of the humanitarian crisis unfolding on the island. These allegations support much more than “an inference of mere knowledge on Rio Tinto’s part,” McKeown op. at 792; it supports an inference that Rio Tinto actively encouraged the killing of Bougainvilleans. It is “sufficient factual matter” for plaintiffs “to ‘state a claim to relief that is plausible on its face,’ ” even if plaintiffs must allege that Rio Tinto specifically intended to harm the residents of Bougainville. Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).
In any event, it is far from clear that such specific intent is necessary to satisfy a mens rea of purpose under international law. As our concurring colleagues note, Pregerson Op. at 774 n. 1, the “purpose” language of the Rome Statute’s Article 25(c)(3) “has yet to be construed by the ICC and may be interpreted to be consistent with customary international law, which does not contain a specific intent requirement.” Brief of Amici Curiae International Law Scholars in Support of Plaintiffs-Appellants at 20-21 (Feb. 18, *767 2010). Under customary international law, “[i]n the absence of a specific intent requirement, a perpetrator must act intentionally, but must only be aware of the likely outcome,” in order to be held liable. Id. at 21 (second emphasis added). Article 25(3)(c) thus can be read to state only the “de minimus and obvious point ... that an aider or abettor purposely acts in a manner that has the consequence of facilitating the commission of a crime,” without “ffam[ing] the intent of the aider or abettor with respect to that consequence.” David Scheffer & Caroline Kaeb, The Five Levels of CSR Compliance: The Resiliency of Corporate Liability Under the Alien Tort Statute and the Case for a Counterattack Strategy in Compliance Theory, 29 Berkeley J. Int’l L. 334, 355 (2011); see also Doug Cassel, Corporate Aiding and Abetting of Human Rights Violations: Confusion in the Courts, 6 Nw. J. Int’l Hum. Rts. 304, 312-13 (2008) (“ ‘[P]urpose’ in the ICC Statute need not mean the exclusive or even primary purpose. A secondary purpose, including one inferred from knowledge of the likely consequences, should suffice.”). Because plaintiffs allege that Rio Tinto specifically intended to harm them in aiding and abetting the commission of war crimes, we need not decide whether the broader interpretation of “purpose” would also sustain liability (just as we need not decide whether allegations of knowing but not purposive action would be cognizable).
We conclude that the allegations are sufficient to state a war crimes claim. The complaint alleges purposeful conduct undertaken by Rio Tinto with the intent to assist in the commission of violence, injury, and death, to the degree necessary to keep its mines open.
C. Crimes Against Humanity
The complaint alleges crimes against humanity arising from a food and medical blockade. Under customary international law, primarily defined through the international criminal tribunals at Nuremberg and elsewhere, crimes against humanity require (1) a widespread or systematic attack directed against a civilian population; and (2) a prohibited act. See, e.g., Rome Statute, art. 7, ICTY Statute, art. 5; ICTR Statute, art. 3.
Assuming, without deciding, that Plaintiffs allege the blockade was a widespread and systematic attack, then whether Plaintiffs’ blockade allegation would establish a violation of the law of nations giving rise to an ATS claim under Sosa depends upon whether the blockade constitutes a prohibited act. The articles defining crimes against humanity in each of the relevant international statutes include a list of specific acts constituting crimes against humanity, as well as a more general “other inhumane acts” provision. Rome Statute, art. 7(1); ICTY Statute, art. 5; ICTR Statute art. 3.
All statutes list “extermination” as a prohibited act amounting to a crime against humanity. Rome Statute, art. 7(l)(b); ICTY Statute, art. 5(b); ICTR Statute art. 3(b). Their definitions of what constitutes extermination, however, differ. Only the Rome Statute refers to the denial of access to the necessities of life. Its definition of “extermination” states that the term “includes the intentional infliction of conditions of life, inter alia the deprivation of access to food and medicine, calculated to bring about the destruction of part of a population....” Rome Statute, art. 7(2)(b). Notably, the Rome Statute does not mention a blockade. Moreover, the deprivation of access to necessities is not necessarily synonymous with a blockade, because such deprivation can be effected without the imposition of a blockade.
*768 The ICTR and the ICTY do not refer to deprivation of food and medicine. The ICTR “requires proof that the accused participated in a widespread or systematic killing or in subjecting a widespread number of people or systematically subjecting a number of people to conditions of living that would inevitably lead to death....” Gacumbitsi v. Prosecutor, Case No. ICTR-2001-64-A, Judgment, ¶ 86 (July 7, 2006). The ICTY requires the “intent to kill on a massive scale.” Prosecutor v. Brdjanin, Case No. IT-99-36-A, ¶ 477 (Int’l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007).
Since none of the statutes explicitly include a blockade in their definition of extermination, Plaintiffs’ claim for crimes against humanity can come within the statutes only if the blockade constitutes “other inhumane acts.” A food and medical blockade may well be an “other inhumane act[ ]” constituting a crime against humanity. The International Law Commission has recognized that the statutes could not list every possible crime against humanity, stating that “it was impossible to establish an exhaustive list of the inhumane acts which might constitute crimes against humanity.” Prosecutor v. Kupreskic, et al., IT-95-16-T, Judgment, ¶ 565 n. 828 (Jan. 14, 2000) (quoting Report of the International Law Commission on the Work of its Forty-Eighth Session, 6 May-26 July 1996, UNGAOR 51st Sess. Supp. No. 10 (A/51/10) (Crimes Against the Peace and Security of Mankind), ¶ 17).
To meet the Sosa test, however, the blockade must be a violation of a recognized specific norm. The statutes do not create such a norm. There is no source of recognized international law that yet identifies a food and medical blockade as an “other inhumane act[ ]” or otherwise qualifies it as a crime against humanity. In the absence of any such source, a food and medical blockade does not violate a specific internationally recognized norm within the meaning of Sosa.
The district court’s original dismissal of Plaintiffs’ claim alleging crimes against humanity arising from the medical and food blockade must be affirmed. We note that Plaintiffs’ claim for genocide is also pled as a crime against humanity, and as we have explained, the genocide claim does satisfy the Sosa requirements.
D. Racial Discrimination
The complaint alleges that Rio Tinto engaged in racial discrimination “under color of law,” although it does not explain its theory. There is a great deal of support for the proposition that systematic racial discrimination by a state violates a jus cogens norm and therefore is not barred from consideration by the act of state doctrine. See Siderman de Blake, 965 F.2d at 718 (holding a violation of a jus cogens norm is not a sovereign act); see also id. at 717 (noting systematic racial discrimination violates a jus cogens norm when it is committed by a state) (citing Restatement (Third), § 702 cmt. n).
Assuming that Plaintiffs have adequately alleged action under color of law, the controlling question then becomes whether the international norm prohibiting systematic racial discrimination is sufficiently specific and obligatory to give rise to a cause of action under the ATS. We conclude it is not. Notably, the United States’ ratification of the Convention on the Elimination of All Forms of Racial Discrimination contained a declaration that the treaty was not self-executing. U.S. Reservations, Declarations, and Understandings, International Convention on the Elimination of All Forms of Racial Discrimination, § III, 140 Cong. Rec. S763402 (June 24, 1994). This declaration indicates that the treaty alone does not estab *769 lish a norm sufficiently specific, universal, and obligatory to give rise to a cause of action under the ATS, because the treaty provisions are not enforceable in our courts. See Sosa, 542 U.S. at 735, 124 S.Ct. 2739 (noting the United States’ understanding that the International Covenant on Civil and Political Rights was not self-executing meant that the treaty “did not itself create obligations enforceable in federal courts”).
Additionally, the treaty itself provides a definition of racial discrimination[1] but does not provide any such definition of systematic racial discrimination, nor even include the word “systematic.” See International Convention on the Elimination of All Forms of Racial Discrimination, 660 U.N.T.S. 195 (entered into force Jan. 4, 1969) (“Racial Discrimination Convention”). Notably, the international norm prohibiting systematic racial discrimination has been given no further content through international tribunals, subsequent treaties, or similar sources of customary international law. The Racial Discrimination Convention is in this way quite different from the Genocide Convention, whose definition of genocide has been repeatedly reinforced in international and domestic law. See supra, Section IV(A)(1).
As the Supreme Court noted in Sosa, “federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.” 542 U.S. at 732, 124 S.Ct. 2739. See also Marcos II, 25 F.3d at 1475 (“Actionable violations of international law must be of a norm that is specific, universal, and obligatory.”). In holding on remand that the racial discrimination claim need not be exhausted, the district court understood, as do we, that there is a universally recognized prohibition against systematic racial discrimination. The district court, however, on remand did not address the additional requirement under Sosa that the prohibition be sufficiently specific and obligatory. The district court’s origin.1 dismissal of the claim must be affirmed on the ground that the norm does not meet the Sosa requirements.
It is important to recognize that the claim of racial discrimination as set forth in Count IV of the complaint is for a violation of the Racial Discrimination Convention. It is not a claim of apartheid as defined in the relevant international statutes. See International Convention on the Suppression and Punishment of the Crime of Apartheid, 13 I.L.M. 50, 1015 U.N.T.S. 243 (1976); see also Rome Statute of the International Criminal Court (“Rome Statute”), July 17, 1998, 2187 U.N.T.S. 90 (defining the crime of apartheid as “inhumane acts ... committed in the context of an institutionalized regime of systematic oppression and domination by one racial group over any other racial group or groups and committed with the intention of maintaining that regime”). A claim premised on apartheid may be cognizable under the ATS. See e.g. Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d 254, 260 *770 (2d Cir.2007) (vacating the district court’s dismissal of the plaintiffs’ ATS claims for aiding and abetting apartheid); see also Restatement (Third) of Foreign Relations § 702, cmt. i (“Racial discrimination is a violation of customary law when it is practiced systematically as a matter of state policy, e.g., apartheid in the Republic of South Africa.”). We assume, without deciding, that a claim akin to apartheid would be cognizable under the ATS, but the complaint in this case does not allege such a claim.
V. CONCLUSION
The district court’s order on prudential exhaustion is AFFIRMED. The district court’s dismissal of the claims for racial discrimination and crimes against humanity is AFFIRMED. The dismissal of the claims for genocide and war crimes is REVERSED. The case is REMANDED to the district court for further proceedings on the claims of genocide and war crimes.
AFFIRMED in part; REVERSED and REMANDED in part. Each party to bear its own costs.

. The Convention defines racial discrimination as:
any distinction, exclusion, restriction or preference based on race, colour, descent, or national or ethnic origin which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of human rights and fundamental freedoms in the political, economic, social, cultural or any other field of public life.
International Convention on the Elimination of All Forms of Racial Discrimination, 660 U.N.T.S. 195 (entered into force Jan. 4, 1969), art. 1(a).